Marsha and Kenneth KLEIN, Husband
and Wife, Appellants

v.

Craig ARONCHICK, M.D. & PA. Hos-
pital Gastro Associates, Ltd. PA Hos-
pital of the University of PA.

Superior Court of Pennsylvania.

Argued Feb. 5, 2013.
Filed Jan. 7, 2014.
Reargument Denied March 18, 2014.

Barbara Axelrod, Philadelphia, for appellants.

Dorothy Duffy, Plymouth Meeting and Dan H.M. Tran, Philadelphia, for Aronchik & PA Hospital Gastro Assoc., appellees.

Teresa F. Sachs, Philadelphia, for PA Hospital of the University of PA., appellee.

BEFORE: FORD ELLIOTT, P.J.E., LAZARUS and FITZGERALD,* JJ.

OPINION BY FORD ELLIOTT, P.J.E.:

Marsha and Kenneth Klein (collectively, "Klein" or "appellants") appeal from the judgment entered February 23, 2012. After careful review, we reverse.

Marsha Klein suffered from chronic constipation for over 30 years. She consulted with Craig Aronchick, M.D., a gastroenterologist, who prescribed Visicol, a pill form of sodium phosphate.[1] Visicol was tested and approved as a preparation to cleanse the colon for a colonoscopy; Dr. Aronchick's prescription of Visicol for long-term treatment of chronic constipation was an off-label use.

Klein continued to take 9 grams of Visicol daily for approximately five years. Eventually, she began to experience symptoms including dizziness and fatigue. Increased creatinine levels indicated kidney disease, and she was referred to K. Adu Ntoso, M.D., a nephrologist (kidney specialist), who took her off Visicol. Klein's creatinine levels stabilized and her phosphate level dropped. According to Dr. Ntoso, Klein has only 19 percent kidney function versus 90 percent for a healthy 50–year–old woman. She suffers from permanent, progressive kidney disease.

---

* Former Justice specially assigned to the Superior Court.

1. Dr. Aronchick is the inventor and patent-holder of Visicol.

At trial, Klein's expert, Bradley M. Denker, M.D., testified that her kidney failure was caused by long-term ingestion of Visicol as prescribed by Dr. Aronchick. Dr. Denker is a board-certified nephrologist and a professor at Harvard Medical School. Dr. Denker opined that it is clear from the medical literature that phosphate ingestion can cause kidney damage, and noted that Klein's elevated phosphate levels after being on Visicol for five years was consistent with phosphate ingestion and chronic phosphate nephropathy. Dr. Denker testified that Klein did not have kidney disease prior to taking Visicol and her phosphate levels stabilized after stopping Visicol.

Defendants' experts testified that there was nothing in the literature to support Klein's theory that long-term use of Visicol for chronic constipation can cause kidney disease. Defendants also referred to Klein's alleged history of bulimia, hypertension and NSAID use as alternative explanations for her kidney disease. Following trial, the jury found Dr. Aronchick negligent; however, they determined that his negligence was not the factual cause of Klein's injuries. Post-trial motions were denied, and this timely appeal followed.

Klein has raised the following issues for this court's review on appeal:

I. Did the trial court err in precluding the plaintiffs from eliciting any testimony that the defendant's negligence increased the risk of harm to Mrs. Klein, in the belief that a medical expert must specifically discuss "increased risk of harm" in his report, where (a) our courts have consistently held that a medical expert is not required to use "magic words" in his report, in order to testify on increased risk of harm; (b) Dr. Denker's report discussed the risks of over-ingestion of Visicol; and (c) the testimony of defendants' medical experts would not have changed if plaintiffs had elicited such testimony?

II. Was it reversible error to permit the defendants to introduce Mrs. Klein's alleged remote history of bulimia, over plaintiffs' strenuous objection, and repeatedly bring it up in a misleading attempt to persuade the jury that this was the cause of her kidney disease, where their own medical experts did not support this theory and the only one who discussed it in his report conceded that a causal connection could not be established?

III. Did the trial court err in allowing the defendants to present cumulative expert testimony from three medical experts, while preventing the plaintiffs from introducing any expert testimony that defendants' negligence increased the risk of harm to Mrs. Klein?

IV. Did the trial court err in allowing defendants to introduce the contents of hearsay medical literature as substantive evidence?

Klein's brief at 5.

In her first issue on appeal, Klein argues that the trial court erred in preventing Dr. Denker from testifying that Dr. Aronchick's negligent over-prescription of Visicol and failure to monitor her over a period of years increased the risk that Klein would suffer permanent kidney damage. According to Klein, she was entitled to argue that Dr. Aronchick's negligence either directly caused her kidney failure, or at least increased the risk of such harm occurring.[2] We agree.

**2.** (B) Increased Risk of Harm [*to be read when appropriate* ]

■ "The admissibility of evidence is a matter addressed solely to the discretion of the trial court and may be reversed only upon a showing that the court abused its discretion." *Commonwealth v. Marshall*, 743 A.2d 489, 492 (Pa.Super.1999), *appeal denied*, 563 Pa. 613, 757 A.2d 930 (2000) (citation omitted). "Thus our standard of review is very narrow.... To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *McManamon v. Washko*, 906 A.2d 1259, 1268–1269 (Pa.Super.2006), *appeal denied*, 591 Pa. 736, 921 A.2d 497 (2007) (citations omitted).

In the seminal case on increased risk of harm, *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280 (1978), the decedent died of a heart attack. The plaintiff's medical expert, Dr. Cyril Wecht, testified that if the defendant had employed certain methods and treatment which he described, the decedent would have had a 75% chance of survival. *Id.* at 263, 392 A.2d at 1283. Dr. Wecht further testified that this substantial chance of recovery was terminated by the defendant's failure to provide prompt treatment. *Id.* The defendant's expert witness testified that death was imminent when the decedent arrived at the hospital and that he would have died regardless of any treatment the defendant might have provided. *Id.* Our supreme court held that Dr. Wecht's testimony was sufficient to create a *prima facie* case of causation.

When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass. The law does not in the existing circumstances require the plaintiff to show to a certainty that the patient would have lived had she been hospitalized and operated on promptly.

*Id.* at 271–272, 392 A.2d at 1288, quoting *Hicks v. United States*, 368 F.2d 626, 632 (4th Cir.1966).

In Dr. Denker's report, he states to a reasonable degree of medical certainty that Dr. Aronchick's negligent over-prescription of Visicol for Klein's chronic constipation directly caused her kidney disease. For example, Dr. Denker states, "In my opinion, Ms. Klein's kidney disease is due to phosphate nephropathy from long term, unmonitored Visicol therapy for chronic constipation." (Dr. Denker's report, 7/12/10 at 1; RR at 57a.) "In my opinion, within all reasonable medical certainty, Mrs. Klein suffered severe [ ] and irreversible chronic renal failure on the basis [of] phosphate nephropathy due to

---

> When a defendant physician negligently fails to act or negligently delays in taking indicated diagnostic or therapeutic steps, and his or her negligence is a factual cause of injuries to the plaintiff, that negligent defendant physician is responsible for the injuries caused.
>
> Where the plaintiff presents expert testimony that the failure to act or delay on the part of the defendant physician has increased the risk of harm to the plaintiff, this testimony, if found credible, provides a suf-
>
> ficient basis from which you may find that the negligence was a factual cause of the injuries sustained.
>
> If there has been any significant possibility of avoiding injuries and the defendant has destroyed that possibility, [he] [she] may be liable to the plaintiff.
>
> It is rarely possible to demonstrate to an absolute certainty what would have happened under circumstances that the wrongdoer did not allow to come to pass.
>
> Pa.SSJI (Civ), § 11.02(B) (2005).

the Visicol treatment." (*Id.* at 2; RR at 58a.) "This medication was never intended for use in patients with chronic constipation and the failure to appropriately monitor and re-evaluate over a 5 year period led to the development of severe chronic renal failure in Mrs. Klein." (*Id.* at 3–4; RR at 59a–60a.) Appellees argue it is clear from a reading of Dr. Denker's overall report that he was making a direct connection between Dr. Aronchick's prescription of Visicol and Klein's chronic renal failure. Therefore, Klein's expert made the requisite link between Dr. Aronchick's negligence and the harm suffered.

Thus, appellees argue that where, as here, the plaintiff's expert issues a report opining that the defendants' negligence was the direct cause of the plaintiff's harm, the plaintiff is not entitled to an increased risk of harm instruction. Appellees contend that direct causation and increased risk are mutually exclusive theories of recovery and where the plaintiff's experts can testify to direct causation within a reasonable degree of medical certainty, increased risk is inapplicable. (*See* appellees' brief at 22 ("under Pennsylvania law, a plaintiff cannot proceed under both causation theories; evidence of 'direct' causation precludes application of the 'increased risk of harm' causation standard").) This argument appears to derive from language in *Mitzelfelt v. Kamrin,* 526 Pa. 54, 584 A.2d 888 (1990), to the effect that the "relaxed standard" of increased risk applies where it is "impossible" for an expert to state with a reasonable degree of medical certainty that the negligence actually caused the plaintiff's harm.

In *Mitzelfelt,* the plaintiff developed quadriparesis during a cervical laminectomy. Quadriparesis is a partial paralysis of all four extremities. *Id.* at 58, 584 A.2d at 890. There was some evidence that her blood pressure had dropped below 80 during surgery, compromising the blood supply to the cervical spinal cord. Dr. Henry Shenkin testified that the compromise in blood pressure was sufficient to cause paraparesis; however, he also testified that in 20% of cases, the patient will be weaker following surgery irrespective of treatment. "As he stated during cross examination, *no* physician could testify to a reasonable degree of medical certainty that the harm was caused by malpractice. The most that could be said was that the drop in blood pressure increased the likelihood that harm would have resulted." *Id.* at 64, 584 A.2d at 893 (emphasis in original).

The court in *Mitzelfelt* analogized the case to its seminal decision in *Hamil,* and determined that the increased risk of harm instruction was warranted. In *Hamil,* the plaintiff's expert testified that had he been treated properly, he would have had a 75% chance of surviving the heart attack; however, this substantial chance of recovery was terminated by the defendant's failure to provide prompt treatment. Similarly, in *Mitzelfelt,* Dr. Shenkin testified that a 30 point drop in blood pressure was significant enough to compromise blood pressure to the spinal cord which can cause paraparesis. *Id.* at 67, 584 A.2d at 894. This satisfied the first prong of the *Hamil* test, *i.e.,* whether the plaintiff's expert can testify to a reasonable degree of medical certainty that the acts or omissions complained of could cause the type of harm the plaintiff suffered. *Id.*

The second step is to determine whether the acts complained of caused the actual harm suffered by the appellant. This is where we apply the relaxed standard. As the experts all testified, twenty percent of patients do poorly after this surgery. As such, it would have been impossible for any physician to state with a reasonable degree of medical certainty that the negligence actually caused the

condition from which Mrs. Mitzelfelt suffered. The most any physician could say was that he believed, to a reasonable degree of medical certainty that it *could have* caused the harm. Once Dr. Shenkin rendered this opinion, it then became a question for the jury whether they believed it caused the harm in this case.

*Id.* (emphasis in original).[3]

Following *Mitzelfelt,* in *Billman v. Saylor,* 761 A.2d 1208 (Pa.Super.2000), which only dealt with whether an increased risk of harm case was properly made out sufficient to go to the jury, the court adopted the "impossible standard" language in describing when an increased risk of harm instruction is appropriate:

> In *Mitzelfelt, supra,* the Pennsylvania Supreme Court explained that in some cases, the standard of proof regarding medical expert testimony is an impossible standard. These are the cases in which, irrespective of the quality of the medical treatment, a certain percentage of patients will suffer harm. In such cases, where the plaintiff is unable to show to a reasonable degree of medical certainty that the physician's actions/omissions caused the resulting harm, but is able to show to a reasonable degree of medical certainty that the physician's actions/ omissions increased the risk of harm, the question of whether the conduct caused the ultimate injury should be submitted to the jury.

*Id.* at 1212 (citations omitted).[4] *See also Vogelsberger v. Magee–Womens Hospital of UPMC Health System,* 903 A.2d 540, 563 (Pa.Super.2006), *appeal denied,* 591 Pa. 685, 917 A.2d 315 (2007) ("this standard is relaxed in cases such as the instant case, where it is impossible to state with a reasonable degree of medical certainty that the negligence actually caused the injury").

■ Since *Billman,* a number of lower court cases, and some memorandum decisions from this court, have relied on the "impossible standard" language for the

---

**3.** Notably, in *Mitzelfelt,* the surgeons who performed the procedure settled and obtained a joint tortfeasor release on the day trial was to commence. The plaintiffs had asserted that Mrs. Mitzelfelt's head was negligently positioned during surgery, causing neck flexion which allegedly resulted in her quadriparesis. Dr. Shenkin was the expert of the defendant surgeons but was called by the plaintiffs as their sole liability expert. With the surgeons having settled prior to trial, the plaintiffs presented no expert testimony with respect to the negligence of the surgeons, but instead proceeded on the alternative theory that the anesthesiologist negligently failed to maintain Mrs. Mitzelfelt's blood pressure at a level which would facilitate blood flow to the spinal cord. This court held that Dr. Shenkin's testimony, in which he opined that the drop in blood pressure "could have" caused Mrs. Mitzelfelt's quadriparesis, did not rise to the level of certainty required to constitute competent evidence for the jury's consideration. *Mitzelfelt v. Kamrin,* 379 Pa.Super. 121, 549 A.2d 935, 940 (1988), *reversed,* 526 Pa. 54, 584 A.2d 888 (1990). The majority opinion in this court's decision in *Mitzelfelt* addressed *Hamil* only in a footnote, finding that it did not apply in that case. *Id.* at 939 n. 3.

**4.** It should be noted that in *Billman,* this court actually reversed summary judgment in favor of the defendants, finding that the issue of causation should have been submitted to the jury. In *Billman,* the plaintiff declined surgery to remove blood clots from his leg, against medical advice. *Billman,* 761 A.2d at 1210. The defendant doctor did not administer any drugs to aid in dissolving the blood clots. *Id.* Eventually, the plaintiff did consent to surgery, but by that time, it was necessary to amputate the leg. *Id.* The plaintiff's expert stated that the plaintiff should have been given an anticoagulant, heparin, which would have increased the chances of saving the leg. *Id.* at 1214. We agreed that this was sufficient evidence of increased risk of harm to create a jury question as to whether the defendant's failure to administer heparin was a proximate cause of the plaintiff's amputation.

proposition that direct causation and increased risk of harm are mutually exclusive, and plaintiffs may not pursue both theories of recovery. *See, e.g., Brown v. Sloane,* 2011 WL 6296640 (Phila.2011), *affirmed,* 55 A.3d 151 (Pa.Super. filed July 31, 2012) (unpublished memorandum) ("Thus, an 'increased risk of harm' instruction cannot be given where the plaintiff introduces evidence of a direct cause of the plaintiff's injury.") (citations omitted); *Wright v. Conte,* 968 A.2d 805 (Pa.Super.2009) (unpublished memorandum at 14) ("Therefore, '[appellant's] expert made the requisite link between [appellee's] negligence and the harm suffered by [appellant]' and the increased risk of harm instruction was not warranted.").[5] Appellees cite to these cases to support the mutually exclusive principle. Additionally, the trial court may very well have been misled by these cases and bound by any Philadelphia Court of Common Pleas decision on this issue. However, a close study of *controlling* precedent reveals that direct causation and increased risk of harm are not mutually exclusive, but simply alternative theories of recovery which, depending on the facts and the expert testimony, may both apply in a given case.

Although the "impossible standard" language recited in increased risk of harm cases originated from *Mitzelfelt,* it is important to note that *Mitzelfelt* relied on *Hamil* and *Jones v. Montefiore Hospital,* 494 Pa. 410, 431 A.2d 920 (1981), for its holding, and expressly stated that, "We are not establishing a new principle of law in this case. We are merely reemphasizing a well established principle that has existed since the [*Hamil*] case." *Mitzelfelt,* 526 Pa. at 68, 584 A.2d at 895. Because context is everything in examining

and interpreting precedent, it is therefore appropriate to examine *Jones* in detail.

In *Jones,* the plaintiff alleged that the defendants failed to remove masses in her right breast and failed to perform necessary post-operative tests, resulting in breast cancer which spread to her lymph nodes. A jury trial resulted in verdicts for the defendants. On appeal to this court, the plaintiff argued that the trial court erred in denying her request for an instruction on increased risk of harm. This court affirmed, distinguishing *Hamil* and finding that the plaintiff in *Jones* was claiming that the defendants actually caused the harm, not that they had merely increased the risk of her developing cancer. The plaintiff's contention was that if the mass had been timely removed, she would not have developed cancer. *Jones v. Montefiore Hospital,* 275 Pa.Super. 422, 418 A.2d 1361, 1365 (1980). This court acknowledged that had Mrs. Jones argued, as the plaintiff did in *Hamil,* that failure to remove the masses in her right breast substantially increased the risk that her breast would have to be removed, then it would have been error for the trial court not to have given the requested point for charge. *Id.* However, this was not Mrs. Jones' theory at trial. *Id.* Although Mrs. Jones' expert did make two references to increased risk of harm, they were brief and her attorney did not pursue the point. *Id.* at 1365 n. 3. This court determined that the issue of increased risk was not sufficiently developed and argued to the jury, and therefore it was not error to refuse the requested instruction. *Id.*

On further appeal to the Pennsylvania Supreme Court, the court reversed and

---

**5.** This writer was a member of the three-judge panel in *Wright.* However, in *Wright,* there was no evidence of increased risk presented at trial; and we found that even if the plaintiff were entitled to the instruction, it was harmless error because the jury found the defendant non-negligent and never reached the question of causation. *Id.* at 15.

remanded for a new trial. The court found that there was sufficient evidence presented by the parties, including testimony from defendants' own experts, to raise the issue of increased risk. *Jones,* 494 Pa. at 418–419, 431 A.2d at 924–925. For example, Mrs. Jones' medical expert testified that even if the cancerous mass in her breast were a new one and not the same mass for which she had originally sought treatment, if it had been diagnosed and removed earlier, the cancer probably would not have spread to a lymph node. *Id.* at 418, 431 A.2d at 924–925. One of the defendants' experts agreed that prognosis after metastasis to a lymph node is not as favorable as if metastasis had not occurred. *Id.* Another one of the defendants' experts specifically responded to the issue of increased risk, testifying that Mrs. Jones already had cancer and that nothing her doctors did, or failed to do, jeopardized her eventual outlook. *Id.* at 419, 431 A.2d at 925.

As our supreme court observed, this was the same defense as that advanced in *Hamil, i.e.,* that the patient was already suffering from a heart attack and would not have survived anyway. *Id.* However, from the testimony, the jury could have reasonably concluded that failure to either remove the original mass, or to properly test and treat a new mass, prevented early detection of Mrs. Jones' breast cancer and increased the risk of mastectomy or, at the very least, that the cancer would metastasize. *Id.* at 419, 431 A.2d at 925. As such, the trial court's refusal to charge as requested on increased risk of harm constituted error entitling Jones to a new trial:

> We conclude that the jury should have been instructed to impose liability if it decided that appellees' negligent conduct increased the risk of harm and that such increased risk was a substantial factor in bringing about the harm actually inflicted upon Mrs. Jones, *whether or*

*not the medical testimony as to causation was expressed in terms of certainty or probability.* Undoubtedly, an unsuccessful effort to prove that appellees' conduct was the direct and only cause of harm might well have succeeded in persuading the jury that appellees' conduct at least increased the risk of the particular harm inflicted and was a substantial factor in bringing it about. Section 323(a) was designed to relax a plaintiff's burden of proving causation, not to compound it. Because it is clear that sufficient evidence was presented by both parties to raise the issue of increased risk, we conclude that appellants were entitled to a charge based on Section 323(a).

*Id.* at 418, 431 A.2d at 924 (emphasis added).

■ Therefore, our supreme court in *Jones* clearly did not view increased risk and direct causation as mutually exclusive. Rather, they are alternative theories of recovery. A plaintiff is entitled to an instruction on increased risk where there is competent medical testimony that a defendant's conduct at least increased the risk that the harm sustained by the plaintiff would occur. *See also Brozana v. Flanigan,* 309 Pa.Super. 145, 454 A.2d 1125 (1983) (rejecting plaintiff-appellant's argument that the trial court erred in its charge on causation; "Taken as a whole, the charge correctly informed the jury that appellee could be found liable if his negligence **either** was a substantial factor in bringing about the loss of appellant's leg **or** increased the risk of losing the leg and that increased risk was a substantial factor in the loss of the leg."), citing *Jones, supra; Hamil, supra; Hoeke v. Mercy Hospital of Pittsburgh,* 299 Pa.Super. 47, 445 A.2d 140 (1982); Restatement (Second) of Torts (1965) § 323(a) (emphasis added).

■ The trial court specifically precluded Klein from pursuing an increased risk of harm theory stating that Dr. Denker's report only addressed direct causation. Turning to Dr. Denker's report, we agree with Klein that a fair reading of his entire report demonstrates that he was of the opinion that Dr. Aronchick's negligence in over-prescribing Visicol to Klein and also failing to monitor and follow-up during the years in which she continued to ingest Visicol, at least increased the risk that she would develop chronic kidney disease. Clearly, had Dr. Aronchick properly monitored Klein, her onset of kidney disease would have been discovered in time to treat her. For example, Dr. Denker states that, "The time course of renal failure development and stabilization of renal function is consistent with phosphate nephropathy," noting that Klein had significant loss of renal function between December 2005 and February 2008, but her serum creatinine stabilized since Visicol was stopped. (Dr. Denker's report, 7/12/10 at 3, ¶ 2; RR at 59a.) Dr. Denker was unable to find any other causes of Klein's chronic renal disease. Dr. Denker found that Klein's laboratory results were consistent with ingesting large amounts of phosphate over time:

> Although elevated phosphate levels can be seen with advanced chronic kidney disease, the coincident finding of low potassium levels (even with supplements) was consistent with large amounts of orally absorbed phosphate and potassium chelation in the intestine (contributing to low potassium levels in the blood). With discontinuation of the Visicol, Mrs. Klein[']s serum phosphate levels dropped dramatically to 2mg/dl which is below normal.

*Id.* ¶ 4.

Dr. Denker opined that Dr. Aronchick negligently failed to follow-up and monitor Klein during the time she was taking Visicol:

> It is also my opinion that Dr. Aronchik [sic] deviated from any reasonable standards of care in the way he prescribed and failed to monitor the Visicol therapy. As of 2005 Dr. Aronchik [sic] was aware, per his deposition, that phosphate nephropathy was associated with preparations such as Visicol, yet from that year to 2008 he repeatedly prescribed this medication without any followup or monitoring at all. It is below the standard of care to refill prescriptions as was done here without any patient monitoring.

*Id.* ¶ 6. Dr. Denker also observed that prescribing Visicol for chronic constipation was an off-label use, and the medication was never intended for use in patients with chronic constipation over a five-year period without appropriate monitoring and evaluation. (*Id.* at 3–4; RR at 59a–60a.)

■ It is true that Dr. Denker never specifically referred to increased risk of harm in his report. However, "[a]lthough preferred, the expert is not necessarily required to use the 'magic words' of 'increased the risk,' so long as the opinion is expressed to the requisite degree of medical certainty." *Billman,* 761 A.2d at 1213, quoting *Wolloch v. Aiken,* 756 A.2d 5, 15 (Pa.Super.2000). Dr. Denker repeatedly stated that Klein's chronic kidney disease was "consistent" or "most consistent" with Dr. Aronchick's over-prescription of Visicol for chronic constipation, without any appropriate patient monitoring or follow-up care. Examining Dr. Denker's report in its entirety, he opined, to a reasonable degree of medical certainty, that Klein's severe and irreversible chronic renal failure was consistent with phosphate nephropathy caused by the Visicol treatment; or, in the alternative, Dr. Aronchick's over-prescription of Visicol for chronic constipa-

tion without any patient monitoring at least increased the risk that Klein would develop chronic renal disease. As such, Dr. Denker should have been permitted to testify regarding increased risk of harm.

As explained above, Dr. Denker's proposed testimony was not inconsistent with his pre-trial report. In addition, there were numerous allegations in Klein's complaint pertaining to increased risk, e.g., that Visicol was not approved for long-term use; that Dr. Aronchick continued to prescribe Visicol to Klein for over seven years without proper follow-up care; that Dr. Aronchick knew Klein was at higher risk for renal disease as a result of phosphate toxicity; and that Dr. Aronchick failed to have proper policies and procedures in place to ensure that medicines such as Visicol are properly prescribed and monitored. Thus, appellees were put on notice that Klein might pursue an increased risk of harm theory of recovery at trial.[6]

Furthermore, as Klein states, appellees would not have been prejudiced by the admission of such testimony, where their experts all testified that Visicol could not possibly have caused Klein's kidney disease. (Klein's brief at 27–28.) Appellees' experts adamantly denied that excessive use of Visicol can cause chronic phosphate nephropathy, and their opinions were not going to change regardless of what was in Dr. Denker's report. In fact, they refused to even acknowledge that chronic phosphate nephropathy is a recognized medical condition. The trial court's ruling that Klein could not elicit any testimony from Dr. Denker regarding increased risk of

harm was reversible error requiring a new trial.

We will address Klein's remaining issues on appeal for purposes of re-trial, and also for *allocatur* purposes. Although the first issue is dispositive of the appeal, we find that there are actually three separate but equally valid bases for reversal. *See Commonwealth v. Markman*, 591 Pa. 249, 282, 916 A.2d 586, 606 (2007) ("Where a decision rests on two or more grounds equally valid, none may be relegated to the inferior status of obiter dictum."), quoting *Commonwealth v. Swing*, 409 Pa. 241, 245, 186 A.2d 24, 26 (1962). *See also id.* n. 15, citing *Reynolds–Penland Co. v. Hexter & Lobello*, 567 S.W.2d 237, 241 (Tex.Civ.App. 1978) ("explaining that an 'alternative holding' exists where the appellate court 'rests its decision under the facts presented on two separate, but equally valid, grounds' "). *Accord Commonwealth v. Reed*, 601 Pa. 257, 265, 971 A.2d 1216, 1220 (2009) (where this court determined that Reed's claims were waived, and even if the claims had not been waived, they were without merit, and explained the basis for our conclusions, our holding that Reed's claim regarding the admission of prior bad acts testimony was meritless was a valid holding that constituted the law of the case).

 In her second issue on appeal, Klein argues that the trial court abused its discretion by admitting evidence that Klein had a history of bulimia. The trial court denied Klein's motion *in limine* to preclude such testimony. Klein contends that this evidence was irrelevant and highly prejudicial. We agree.

We note that

allowing the plaintiff's expert to testify that the delay in undertaking surgery to repair the plaintiff's perforated colon increased the risk of harm).

---

**6.** *See Trent v. Trotman*, 352 Pa.Super. 490, 508 A.2d 580 (1986) (finding that the plaintiff's complaint fairly encompassed the increased risk of harm theory presented at trial, and therefore the trial court did not err in

the admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. Admissibility depends on relevance and probative value. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact. Evidence, even if relevant, may be excluded if its probative value is outweighed by the potential prejudice.

*Commonwealth v. Fransen,* 42 A.3d 1100, 1106 (Pa.Super.2012) [ (*en banc* ), *appeal denied,* 618 Pa. 690, 76 A.3d 538 (2013) ] (internal citations omitted). " 'Unfair prejudice' supporting exclusion of relevant evidence means a tendency to suggest decision on an improper basis or divert the jury's attention away from its duty of weighing the evidence impartially." *Commonwealth v. Wright,* 599 Pa. 270, 325, 961 A.2d 119, 151 (2008). "The function of the trial court is to balance the alleged prejudicial effect of the evidence against its probative value and it is not for an appellate court to usurp that function." *Commonwealth v. Parker,* 882 A.2d 488, 492 (Pa.Super.2005), *affirmed on other grounds,* 591 Pa. 526, 919 A.2d 943 (2007).

*Smith v. Morrison,* 47 A.3d 131, 137 (Pa.Super.2012), *appeal denied,* 618 Pa. 690, 57 A.3d 71 (2012).

■ The trial court decided that the evidence was relevant to causation and also for purposes of attacking Klein's credibility, where she denied a history of bulimia despite the fact it was referenced in the medical records. We address the causation and credibility issues separately.

The only medical reference to bulimia appears in the records of Pamela Peeke, M.D., a nutritionist. Allegedly, Klein sought a consult with Dr. Peeke in 2004 in an effort to deal with a real or imagined inability to regulate her weight. Although the issue as to who first raised a history of bulimia was hotly disputed below, whether it was information given by Klein herself or Dr. Peeke's interpretation of Klein's weight-related issue, it was very clear that Dr. Peeke was not treating Klein for bulimia. Throughout Dr. Peeke's deposition, defense counsel repeatedly referenced Dr. Peeke's records which included a notation "history of bulimia." However, the deposition concluded with Klein's counsel directly asking Dr. Peeke if she was treating Klein for bulimia symptoms. In response, Dr. Peeke made it very clear that this was a condition relating to Klein's experiences as a teenager, 35 years ago:

Q. Did you have any evidence or did you see anything when you were evaluating or treating her, that was compulsively binging and purging or anything like that at that time?

A. No, not at all. This was all by history. And she had noted that that was primarily associated with the problems that she had had with her mother when she was a teenager. Because, apparently, her mother died very young and that was when she was a teenager.

Notes of testimony, deposition of Dr. Peeke, 6/28/10 at 76. There was no further attempt to clarify this response by defense counsel. None of the defendants' experts tied this questionable history of bulimia to Klein's current symptoms. None of the defense experts offered an opinion that Klein's remote history of bulimia could have caused her end-stage renal disease. Therefore, the evidence was irrelevant.

Appellees point to testimony from Dr. Denker that combined with certain medi-

cations, bulimia could negatively affect the kidneys. Dr. Denker conceded on cross-examination that Klein was on numerous medications during the relevant time period. (Notes of testimony, 3/23/11 at 13–14; R.R at 1288b–1289b.) As a general matter, combinations of different medications can affect the kidneys. (*Id.* at 15–16; *id.* at 1290b–1291b.) With regard to bulimia, Dr. Denker testified:

Q. All right. Well, in reference to patients who have an eating disorder, sir, can we agree that those patients generally speaking can have an impact on their renal system?

A. Yes.

Q. And it's a little bit indelicate, Doctor, but if a patient purges intentionally, that can throw the electrolyte system out of whack?

A. Yes.

Q. Is it accurate, sir, that it can even change the blood chemistry; is that also true?

A. Yes.

Q. Is it accurate, sir, that if a patient is not keeping enough fluids in the system, that can have a deleterious and negative affect [sic] on the kidneys as well because our kidneys depend on fluids, true?

A. It doesn't usually cause permanent damage. But you can see transient changes in function from dehydration, yes.

Q. In general, all these lifestyle things can impair the way the kidneys work, true?

A. Yes.

Q. Doctor, you're aware, are you not, and I'm not sure that we saw that on the list, did you review the deposition of Dr. Pamela Peeke?

A. I did.

Q. Is it correct, sir, that there was a history of recovering bulimia reported to Dr. Peeke?

A. Yes.

Q. You know and you've told us bulimia and eating disorders can cause renal problems. How about in general bulimia and eating disorders associated with other medications?

A. Can you please rephrase the question?

Q. Sure. We're talking generally, Doctor, but with regard to what can affect the kidney, if a patient has an eating disorder, bulimia, for example, and is taking medications, the combination of that can affect one's ability to have her kidneys working properly, correct[?]

A. Yes, the bulimia could make things worse in the setting of other medications.

Q. Is it accurate to tell the ladies and gentlemen of the jury that Mrs. Klein never gave you a history of bulimia?

A. That's correct. She did not.

Q. Is it accurate to tell the ladies and gentlemen of the jury that Mrs. Klein never gave Dr. Ntoso a history of bulimia?

A. I'm not sure if he specifically asked, but I didn't see it referenced in his letters either.

Q. Certainly you'll agree, sir, that Mrs. Klein never gave Dr. Aronchik [sic] a history of bulimia?

A. To my knowledge, that's correct.

*Id.* at 16–18; *id.* at 1291b–1293b.

Dr. Denker's testimony on the issue is of no moment because, as stated above, the evidence regarding Klein's alleged history of bulimia was wholly irrelevant and inadmissible. Defendants should not have been permitted to cross-examine Dr.

Denker on the matter in the first place. Furthermore, Dr. Denker's testimony was exceedingly vague, and he certainly never admitted, as appellees contend, that bulimia can cause kidney failure or that Klein suffered from bulimia. Dr. Denker agreed with the general proposition that eating disorders can have an impact on the renal system. Dr. Denker conceded that, combined with medications, bulimia "could make things worse," but counsel never defined such medications.

■■ In addition, the evidence of Klein's history of bulimia was highly prejudicial. Appellants correctly characterized bulimia as a "red flag" and "a highly charged word" which would serve merely to distract the jury from the real issues in the case. Indeed, throughout trial and in closing arguments, defense counsel invited the jury to make an unwarranted causal connection between Klein's history of bulimia as a teenager and her chronic renal disease. As Klein observes, this was a smokescreen. (Klein's brief at 37.) There was never any evidence that Klein's advanced chronic kidney disease could have been caused by her episode of bulimia 35 years prior. Clearly, the defendants wanted to introduce this evidence to confuse and mislead the jury, a tactic that appears to have succeeded, since the jury found negligence but no causation.

■■ Appellees argue that the evidence was relevant to impeach Klein's credibility, since despite the reference to bulimia in the medical records, she denied any history of bulimia in her deposition.

> The law is clear in Pennsylvania that a witness may not be contradicted on matters not germane to the issue involved: *Commonwealth v. Burdell*, 380 Pa. 43, 51, 110 A.2d 193 [ (1955) ]; *Zubrod v. Kuhn*, 357 Pa. 200, 203, 53 A.2d 604 [ (1947) ]; *Commonwealth v. Petrillo*, 341 Pa. 209, 19 A.2d 288 [ (1941) ]. In

*Commonwealth v. Petrillo,* at 223, 19 A.2d at 295, the Court stated:

> "There seems to be considerable misunderstanding on the rules of evidence relating to the contradiction of witnesses. No witness can be contradicted on everything he testifies to in order to 'test his credibility'. The pivotal issues in a trial cannot be 'sidetracked' for the determination of whether or not a witness lied in making a statement about something which has no relationship to the case on trial. The purpose of trials is not to determine the ratings of witnesses for general veracity. A witness can be contradicted only on matters germane to the issue trying. There is no rule more firmly established than this: 'No contradiction shall be permitted on collateral matters.' "

*Hammel v. Christian*, 416 Pa.Super. 78, 610 A.2d 979, 984 (1992), *appeal denied*, 533 Pa. 652, 624 A.2d 111 (1993), quoting *Papa v. Pittsburgh Penn–Center Corp.*, 421 Pa. 228, 229, 218 A.2d 783, 789 (1966).

> In the same case, at 224, 19 A.2d at 295 the Court quoted from Wigmore on Evidence, 3rd ed., Vol. 3, Section 1003 as follows:
>
> > "The only true test [of 'collateralness'] is * * * 'Could the fact, as to which error is predicated, have been shown in evidence for any purpose independently of the contradiction?' "

*Id.*, quoting *Papa, supra* (footnote omitted). Thus, in *Hammel*, for example, the plaintiffs sought to cross-examine the defendant regarding ownership of the vehicle she was driving at the time of the accident. *Id.* at 983. Apparently, the vehicle was actually owned by her father's employer, Kimberly Clark Corporation. *Id.* When asked whose car she was driving, the defendant incorrectly responded, "my

father's." *Id.* This court held that the trial court did not err in disallowing cross-examination of the defendant regarding ownership of the vehicle where it was a collateral matter and would have served to divert the jury's attention from the relevant issues in the case. *Id.* at 984. Similarly, here, Klein's disavowal of an alleged history of bulimia is a collateral matter and really has nothing to do with the case. The bulimia issue was a red herring, and allowing cross-examination regarding the matter served no legitimate purpose.

■ We determine that the probative value of this evidence, if any, was clearly outweighed by its prejudicial effect, and the trial court abused its discretion in denying appellants' motion *in limine* to exclude the evidence of Klein's history of bulimia.[7]

■ Finally, Klein argues that the trial court erred by allowing Dr. Roberts to testify regarding learned treatises. Klein argues that Dr. Roberts did not merely reference these materials, but was permitted to testify to the substance of the articles for the truth of the matter, thereby violating the hearsay rule. Klein preserved this issue by filing a pre-trial motion *in limine* and also objected to Dr. Roberts' testimony at trial.

When offered at a trial to establish principles or theories from their contents, texts and periodicals fall within the tra-

ditional definition of hearsay—an extra-judicial declaration offered to prove the truth of the matter asserted. *See Majdic v. Cincinnati Machine Co.*, 370 Pa.Super. 611, 621–22, 537 A.2d 334, 338–39 (1988) (*en banc*). Thus, at common law, the evidentiary rules restricting the presentation of hearsay statements precluded parties from employing treatise materials as substantive proof of their contents. *See generally* 29 Am.Jur.2d Evidence § 1413 (1994); *Jones v. Constantino*, 429 Pa.Super. 73, 88–89, 631 A.2d 1289, 1297 (1993) (finding that learned writings which are offered to prove the truth of their contents are hearsay and may not properly be admitted into evidence), *appeal dismissed*, 538 Pa. 671, 649 A.2d 673 (1994). The common law rule frequently has been justified on the ground that a lay jury may be confused by the technical nature of the information and therefore place undue emphasis upon or misapply it. *See id.*; W. Kobylak, Annotation, Treatises, Periodicals, or Pamphlets as Exception to Hearsay Rule Under Rule 803(18) of the Federal Rules of Evidence, 64 A.L.R. Fed. 971 § 2 (1999) (stating that "[t]he prohibition against receiving learned treatise materials as exhibits is designed to keep the often voluminous works out of the jury room where they would receive undue attention and em-

---

7. In her third issue on appeal, Klein argues that the trial court erred in allowing the defendants to present three different expert witnesses on causation. Klein contends that the testimony was cumulative and complains that she was only allowed to call one causation expert, Dr. Denker. Here, while all three of defendants' experts ultimately reached the same conclusion, *i.e.*, that Visicol did not cause Klein's chronic kidney disease, they approached the issue from different clinical perspectives. Jesse Goldman, M.D., was a nephrologist and internist; James R. Roberts, M.D., was a medical toxicologist; and David

Kastenberg, M.D., testified as a gastroenterologist. Therefore, while their testimony may have been corroborative, it was not needlessly cumulative. *See Commonwealth v. Flamer*, 53 A.3d 82, 88 n. 6 (Pa.Super.2012) ("Evidence that strengthens or bolsters existing evidence is corroborative evidence; we have previously explained that corroborative evidence is not cumulative evidence."), citing *Commonwealth v. G.D.M., Sr.*, 926 A.2d 984, 989 (Pa.Super.2007), *appeal denied*, 596 Pa. 715, 944 A.2d 756 (2008). The trial court did not abuse its discretion in permitting the testimony.

phasis, and to prevent a jury from rifling through a work and drawing improper inferences from technical language it might not be able properly to understand without expert guidance" (footnotes omitted)). While other jurisdictions, including the federal courts, have moved away from the common law exclusion in favor of an exception permitting the admission of treatise materials as substantive evidence on a limited basis, *see, e.g.,* F.R.E. 803(18), Pennsylvania has not done so. *See* P.R.E. 803(18) (providing that "Pennsylvania does not recognize an exception to the hearsay rule for learned treatises" (citing *Majdic,* 370 Pa.Super. at 611, 537 A.2d at 334)).

*Aldridge v. Edmunds,* 561 Pa. 323, 331–332, 750 A.2d 292, 296–297 (2000) (footnote omitted).

There is no question that if published material is authoritative and relied upon by experts in the field, although it is hearsay, an expert may rely upon it in forming his opinion; indeed, it would be unreasonable to suppose that an expert's opinion would not in some way depend upon the body of works preceding it. Pennsylvania courts have thus permitted, subject to appropriate restraint by the trial court, limited identification of textual materials (and in some circumstances their contents) on direct examination to permit an expert witness to fairly explain the basis for his reasoning. *See* P.R.E. 705 (providing that "[t]he expert may testify in terms of opinion or inference and give reasons therefor"); *see also In re C.R.S.,* 696 A.2d 840, 845 n. 7 (Pa.Super.1997) (suggesting that experts may refer to published works serving as the basis for their opinions). *See generally Cummings v. Borough of Nazareth,* 430 Pa. 255, 265, 242 A.2d 460, 466 (1968) (plurality opinion) (stating that "[i]t is entirely proper in examination and cross-examination for counsel to call the witness's attention to published works on the matter which is the subject of the witness's testimony").

*Id.* at 332, 750 A.2d at 297 (footnote omitted).

■ Over objection, Dr. Roberts discussed at length several studies appearing in the New England Journal of Medicine to explain the basis for his expert opinion that Visicol did not cause Klein's kidney disease:

Q. I will present to you what I marked as Exhibit 100. It's an article entitled Current Concepts, Chronic Constipation by Drs. Lembo and Caveleri. Tell us how this aids in the use of Visicol for the purposes of chronic constipation. And tell us the date of publication first. We would appreciate it.

A. This is published in 2003, about the time that Mrs. Klein was started on her Visicol. This is called a review article. The New England Journal gets together the top people in their field and asks them to write a review on a heart attack or lung cancer. This one is a review on chronic constipation. It was considered the state-of-the-art article in 2003 where a doctor who wants to treat someone with chronic constipation would get everything you need to know about chronic constipation from this article.

Q. Does it mention use of Visicol in this article from 2003?

A. Sure does, by brand name. It puts it in a table entitled Medications Commonly Used for Constipation. They mention sodium phosphate, Fleets Phosphate Soda, the liquid and the pill, Visicol.

Q. In addition to that taking place in 2003, can you tell us in reference to your review of the literature prior to coming into the jury and telling them about the various literature on this topic, how a doctor by the name of Medoff contributed to your understanding in 2004.

A. Dr. Medoff studied chronic constipation with the use of Visicol. He gave it to 40–some patients every day for up to a month for the chronic constipation. He measured the effect of the drug on constipation. Found it worked well. Used up to 12 tablets a day. Mrs. Klein was taking six tablets a day. He found after a month that there were no problems with the drug with regard to kidneys or phosphate levels, or any other adverse effects. He found the drug worked pretty well.

Q. Doctor, we also heard—I think the jury heard the name Markowitz as revealing some advances, if you will, to the understanding of sodium phosphate in the context of massive doses as part of colonoscopy preps. Would you explain to the jury from a toxicology standpoint what Markowitz contributed to the understanding with regard to the use of sodium phosphate for colonoscopy preps[?]

A. Dr. Markowitz is probably the leader in the field in this area. He has found in his world search less than 40 patients who he thinks, not sure, but thinks have a problem by taking large doses of sodium phosphate in a preparation for their colonoscopy. In 2005 he presented in the literature for his colleagues to read sort of a: Here is what I found when I did kidney biopsies on thousands of patients. I found that 21 had kidney failure and they also had used

this sodium phosphate in huge doses for their prep prior to it. He published that as saying there may be a link here, may be a link between high doses and acute kidney failure; meaning that within a few days after you took the drug your kidneys started to fail. That's what he put in his literature. He reviewed it a—he softened his take on it and said: I am not so sure, but we need to be vigilant.

Q. The FDA came out after Dr. Markowitz's work and said: Don't use this with chronic constipation?

A. No. The FDA, when they see something like this, will study it very carefully. After about a year or two of studying they will do their own study, get other patients, other doctors to help them out. The FDA said: Well, this may be a problem when you use it as a prep. However, we are still going to allow, recommend, sanction the use of 40 Visicol tablets in a 12 hour prep. They used probably 60 tablets earlier and went down to 40. Doctors were told in 2006 that you can use 40 tablets of Visicol, you can use 40 in a 12 hour period. They were asked questions about: What about its uses as a laxative specifically? They said: It's safe and effective. We won't ask you to be concerned about it as a laxative.

Notes of testimony, 3/30/11 at 42–45; RR at 1972b–1973b.

We find appellees' extensive questioning of Dr. Roberts ran afoul of the law concerning learned treatises as outlined in *Aldridge, supra.* Dr. Roberts did not merely identify those textual materials, such as Dr. Medoff's article, which formed the basis for his opinion. Rather, Dr.

Roberts was offering these articles for their direct substantive effect and presenting them as authoritative and thus believable. Dr. Roberts was allowed to testify at length regarding specific details of the studies. Dr. Roberts presented the materials for the truth of the matter, to bolster and corroborate his own opinion. This is not permitted. *Aldridge*, 561 Pa. at 333–334, 750 A.2d at 297–298.

*Aldridge* is basically indistinguishable, where counsel employed a lengthy series of leading questions emphasizing the specific contents of the published materials. *Id.* at 328–330, 750 A.2d at 294–296. Similarly, here, defense counsel elicited testimony from Dr. Roberts regarding the substance of the articles: "I think the jury heard the name Markowitz as revealing some advances, if you will, to the understanding of sodium phosphate in the context of massive doses as part of colonoscopy preps"; "Tell us how this aids in the use of Visicol for the purposes of chronic constipation." As in *Aldridge*, the texts were not used to clarify the basis for the expert's opinion, but rather as the means by which opinion evidence was impermissibly conveyed to the jury. *Id.* at 334, 750 A.2d at 298. Defense counsel in *Aldridge* led his expert into great detail about the publications, in that case pediatric textbooks, which supported his diagnosis. Similarly, here, Dr. Roberts delved into the details and specific findings of several articles of which he was not the author. We determine that this testimony constituted impermissible hearsay, and the trial court abused its discretion in allowing this testimony.

Additionally, appellants point out that Dr. Roberts further bolstered his testimony by referring to the New England Journal as "probably the world's most prestigious medical journal," "the final word on most things," and "proven good

science." (Notes of testimony, 3/30/11 at 41–42; RR at 1972b.) Dr. Roberts testified that "If you published there you made the big time. All the important authors, and professors, and doctors want to get published in the New England Journal." (*Id.* at 41; RR at 1972b.) Prior to discussing the research articles above, Dr. Roberts stated that, "You can't get an article in the New England Journal unless it's topnotch and your colleagues believe it's state-of-the-art and it's proven good science." (*Id.* at 41–42; RR at 1972b.) Appellants argue that this was an implicit invitation to the jury to view the substance of the articles as true. (Appellants' brief at 52.) We agree. This was clearly bolstering, attempting to use medical articles published in the New England Journal to increase the credibility of his own opinion in the minds of the jury. The trial court erred in denying appellants' motion *in limine* to limit such testimony, and in overruling their objection at trial.

For these reasons, we are compelled to reverse and remand for a new trial.

Judgment reversed. Remanded for retrial. Jurisdiction relinquished.

FITZGERALD, J. files a Concurring and Dissenting Statement.

Concurring and Dissenting Statement by FITZGERALD, J.:

I respectfully concur in part and dissent in part. I join the majority's disposition of Appellants' first issue. I note, however, that in the two decades since *Mitzelfelt v. Kamrin*, 526 Pa. 54, 584 A.2d 888 (1990), was decided, no Pennsylvania appellate court has explicitly ruled in a published opinion that in the context of a medical malpractice action, a party can simultaneously pursue direct causation and increased risk of harm. Indeed, the trial courts and the Superior Court, in nonprecedential memorandum decisions, have

construed *Mitzelfelt* as precluding such simultaneous pursuit. I agree, however, that our Supreme Court in *Jones v. Montefiore Hosp.*, 494 Pa. 410, 431 A.2d 920 (1981), stated the following: "Undoubtedly, an **unsuccessful** effort to prove that [the defendants'] conduct was the **direct and only cause of harm** might well have **succeeded** in persuading the jury that [the defendants'] conduct at least **increased the risk of the particular harm** inflicted and was a substantial factor in bringing it about." *Id.* at 418, 431 A.2d at 924 (emphases added) (reversing Superior Court's holding that trial court did not err by refusing to give jury charge of increased risk of harm); *accord* Restatement (Second) of Torts § 323(a).

Appellant also challenges the trial court's admission of Ms. Klein's history of bulimia. Unlike the majority, I would hold that such evidence was relevant to impeaching her credibility and I would not disturb the trial court's admission of it. *See generally* Pa.R.E. 607(b).

Finally, with respect to Appellants' contention that Dr. Roberts testified to the truth of the matter asserted regarding the Lembo study published in the New England Journal of Medicine,[1] which was introduced into evidence, I agree with the majority's disposition. Under the unique facts of this case, I would further conclude that Appellants have established prejudice and the trial court committed reversible error. *See Majdic v. Cincinnati Mach. Co.*, 370 Pa.Super. 611, 622, 537 A.2d 334, 340 (1988) (en banc) (holding trial court did not err by prohibiting expert witness from reading contents of treatises into evidence and by not admitting treatises into evidence; *see also Aldridge v. Edmunds*, 561 Pa. 323, 330–35, 750 A.2d 292, 296–99 (2000) (holding trial court committed

harmless error by permitting expert to support his opinion by referring to excerpts from two learned treatises and by admitting them into evidence; in finding harmless error, *Aldridge* Court reasoned that opposing party's expert had earlier referred to one treatise and that both treatises were used for propositions undisputed by either party). Instantly, based on, *inter alia,* the Lembo study, Dr. Roberts opined that "not a single expert in this world" believes Visicol causes kidney failure. N.T., 3/30/11 (afternoon), at 64. The Lembo study from the New England Journal of Medicine—similar to the treatises introduced into evidence in *Aldridge*—was also introduced into evidence. Similar to the plaintiff's counsel in *Aldridge,* Appellants' counsel was unable to cross-examine the authors of the New England Journal of Medicine study.

Appellees counter that Appellants' counsel used the Lembo study during Dr. Roberts' cross-examination and failed to object to the introduction of the Lembo study at trial. I discern no merit to those arguments, however, as Appellants preserved the issue in their pretrial motion *in limine* to preclude the use and introduction of such evidence. *See generally* Pa.R.E. 103(b). I respectfully disagree, however, with the majority's disposition regarding the Markowitz and Medoff studies, and would hold that although the trial court erred, Appellants have not met their burden of establishing the prejudice required for a new trial. *See Aldridge,* 561 Pa. at 334, 750 A.2d at 298.

For these reasons, I concur in part and dissent in part.

---

1. Dr. Roberts also testified about the contents of two other studies that were not introduced into evidence: the Markowitz study in the Kidney International journal and the Medoff study in the Clinical Therapeutics journal.