J-A28006-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| FERNANDO COZZA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NICKOLAS W. JEKOGIAN, III, NICK'S | : | |
| PROPERTIES, LLC, NWJ KANSAS | : | |
| CITY, INC.,  PLAZA PROPERTY | : | No. 1169 EDA 2022 |
| GROUP, LLC AND KANSAS CITY | : | |
| EQUITIES, LLC | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LUIS COZZA, SIGNATURE | : | |
| COMMUNITY INVESTMENT GROUP, | : | |
| LLC, SIGNATURE COMMUNITY | : | |
| MANAGEMENT, LLC, NICKOLAS | : | |
| JEKOGIAN, JR., AS TRUSTEE OF THE | : | |
| JEKOGIAN FAMILY TRUST AND | : | |
| NICKOLAS JEKOGIAN, JR., AS | : | |
| TRUSTEE OF THE BBJ FAMILY TRUST | : | |
| | : | |
| | : | |
| APPEAL OF: NICKOLAS W. | : | |
| JEKOGIAN, III, NICK'S PROPERTIES, | : | |
| LLC, NWJ KANSAS CITY, INC., | : | |
| PLAZA PROPERTY GROUP, LLC AND | : | |
| KANSAS CITY EQUITIES, LLC, | : | |
| SIGNATURE COMMUNITY | : | |
| INVESTMENT GROUP, LLC, | : | |
| SIGNATURE COMMUNITY | : | |
| MANAGEMENT, LLC, NICKOLAS | : | |
| JEKOGIAN, JR., AS TRUSTEE OF THE | : | |
| JEKOGIAN FAMILY TRUST AND | : | |
| NICKOLAS JEKOGIAN, JR., AS | : | |
| TRUSTEE OF THE BBJ FAMILY TRUST | | |

Appeal from the Judgment Entered June 21, 2022
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 150301196

BEFORE: PANELLA, P.J., LAZARUS, J., and SULLIVAN, J.

MEMORANDUM BY PANELLA, P.J.:                    **FILED APRIL 25, 2023**

Nickolas W. Jekogian, III, Nick's Properties, LLC, NWJ Kansas City, Inc., Plaza Property Group, LLC and Kansas City Equities, LLC, Signature Community Investment Group, LLC, Signature Community Management, LLC, Nickolas Jekogian, Jr., as trustee of the Jekogian Family Trust and Nickolas Jekogian, Jr., as trustee of the BBJ Family Trust (collectively "Appellants") appeal from the judgment entered in favor of Fernando Cozza ("Fernando") and Luis Cozza ("Luis") (collectively "the Cozzas"), wherein the Cozzas each received $1,979,579.66. On appeal, Appellants argue that the verdict in favor the Cozzas was the result of bias, as the Cozzas conducted their case-in-chief in person while Appellants had to conduct their case over Zoom due to the Covid-19 pandemic; the trial court improperly admitted hearsay statements at trial; the trial court abused its discretion in rendering various evidentiary rulings; Fernando's claims were barred by the statute of limitations; and the verdict was against the weight of the evidence. We affirm.

This case involves a long and convoluted factual and procedural history relating to allegations that Appellants commingled and misappropriated funds from the Cozzas pertaining to real estate investments made by Jekogian and

- 2 -

the Cozzas.[1] Relevantly, in 1996, Luis began working for Jekogian at his company, NWJ Companies. Luis managed some of Jekogian's properties in Philadelphia and looked for potential investments in the city. Fernando joined the company in 2001, and did some construction and management, but primarily sought out potential investments for the company.

In 2002, Jekogian and the Cozzas executed an agreement to form Kansas City Equities, LLC, ("KCE") a Missouri limited liability company. KCE bought properties in the Kansas City area. Significantly, Fernando, Luis, and Jekogian each owned 33.33% of KCE and each of them was a managing member. The agreement provided that the laws of the State of Missouri would govern the application and interpretation of the agreement and that exclusive jurisdiction over the matter would be in the courts of Pennsylvania or United States District Court for the Eastern District of Pennsylvania. Notably, Fernando resided in Newtown, Pennsylvania, and Luis and Jekogian lived in New York, New York.

In 2003, the Cozzas and Jekogian formed Plaza Property Group ("PPG"), a Missouri limited liability company, and Jekogian formed Nick's Properties, a Missouri corporation that he solely owned. PPG and Nick's Properties purchased numerous buildings. PPG owned 82% of these buildings and Nick's Properties owned 18% of the buildings. Under the operating agreement of

---

[1] The trial court has set forth an extensive recitation of the factual and procedural history in its opinion. *See* Trial Court Opinion, 12/13/21, at 1-18.

PPG, the Cozzas and Jekogian were managing members, and Jekogian's interest of 18.8% and the Cozzas' interest was 81.2% (40.6% for each) of PPG's ownership interest in the underlying properties. The agreement included identical governing law and jurisdiction clauses as the KCE agreement.

In 2005, the Cozzas and Jekogian refinanced various properties with Prudential Mortgage Capital and obtained a loan in the amount of $7.2 million. After paying the mortgages, approximately $1.4 million was left; however, the Cozzas did not receive any portion of this money. Additionally, as part of refinancing, the Cozzas and Jekogian had to amend their operating agreements and Prudential required a separate entity to manage KCE and PPG. Thereafter, the parties formed NWJ Kansas City ("NWJKC"), which became the sole managing member of KCE and PPG. However, while Luis was a director and vice president of NWJKC, Jekogian, in effect, owned and controlled NWJKC, and the Cozzas were no longer managing members of the new company. Further, NWJKC took a 1% interest in both KCE and PPG. The amended operating agreement provided that the sole purpose of KCE and PPG was to acquire, own, and operate properties in Kansas City, Missouri. Sometime thereafter, Luis and Fernando left the companies, and they had

very little involvement aside from receiving annual reports and K-1s[2] at the end of each year.

On May 31, 2006, the state of Missouri determined that NWJKC was administratively dissolved or revoked and ordered that NWJKC must wind up and liquidate its business and affairs. Following NWJKC's dissolution, the Neighborhood Group managed the properties between 2006 and 2008. In 2008, Signature Community Management began managing the properties owned by Jekogian, KCE, and PPG. Jekogian was the CEO and owned between 75 and 85 percent of Signature. Among other things, Signature collected rents for KCE and PPG.

In April 2010, Signature opened new accounts for the various properties at Bank of America, one an aggregate account and the other accounts were for each property or entity. Notably, when each property collected rents, they were deposited into its separate bank account. During the evening, the money in the various accounts was deposited in the aggregate bank account. Accordingly, funds from properties owned by PPG and KCE were commingled with funds from other properties, including companies in which the Cozzas had no ownership interests. The funds from the aggregate account were used to pay for, among other things, renovations of the properties. Eventually the

---

[2] Schedule K-1s are used by partnerships to "report [a partner's] share of the partnership income, deductions, credits, etc." Partner's Instructions for Schedule K-1 (Form 1065), https://www.irs.gov/instructions/i1065sk1 (last visited Mar. 28, 2023).

accounts at Bank America were overdrawn by $100,000 and the accounts were closed. Subsequently, Signature opened about 20 new accounts for individual properties and an account for short-term funding at Chase Bank. Similar to the Bank of America accounts, once the individual properties' accounts received money, the funds were transferred to the short-term funding account and then transferred to Signature.

The KCE and PPG properties struggled to keep utilities on, checks bounced, and vendors refused to work with the properties. Eventually, Signature  stopped making the mortgage payments on the properties. In May 2012, U.S. Bank National Association filed a motion to appoint a receiver against KCE, PPG, and Nick's Properties. Eventually, a court in Missouri appointed a management company as a receiver.

In the interim, in 2009, Jekogian created BBJ Family Trust, a trust for his daughters. Jekogian's father was the trustee and Jekogian was the grantor of the trust. Subsequently, in 2012, Jekogian's father created Jekogian Family Trust, a trust for the benefit of Jekogian's daughters, nieces, and nephews. Jekogian and his sister were the trustees of the Jekogian Family Trust. Between 2011 and 2013, Jekogian transferred ownership interests in various entities, including KCE and PPG, to the trusts. Relevant herein, Jekogian reduced his ownership interest in both KCE and PPG to 1% in 2013 and transferred the remainder of his ownership interest to the trusts. In 2013, the properties were lost to foreclosure.

On March 9, 2015, Fernando filed a complaint against Jekogian, Nick's Properties, and NWJKC. Thereafter, Fernando filed a second amended complaint against Jekogian, Nick's Properties, NWJKC, PPG, and KCE (collectively "Jekogian Defendants"), raising claims of (1) breach of fiduciary duty against Jekogian and NWJKC; (2) breach of contract against NWJKC; (3) accounting against Jekogian, NWJKC, KCE, and PPG; (4) shareholder access to records against KCE and PPG; and (5) statutory personal liability against Jekogian. The Jekogian Defendants filed an answer and new matter. Thereafter, the Jekogian Defendants filed a joinder complaint against Luis, raising claims for joint and several liability, contribution, and indemnification. The Jekogian Defendants alleged that because Luis was a director and vice president at NWJKC, his actions made him jointly and severely liable.

On November 28, 2016, Luis filed an answer to the joinder complaint with new matter and counterclaims, including (1) breach of fiduciary duty against Jekogian and NWJKC; (2) breach of contract against the NWJKC; (3) accounting against Jekogian, NWJKC, PPG, and KCE; (4) statutory personal liability against Jekogian; and (5) declaratory judgment. The Jekogian Defendants filed an answer to Luis's counterclaims with new matter.

On March 2, 2018, Fernando filed a motion for partial summary judgment, arguing that he met the requirements under Missouri law to obtain an accounting of PPG and KCE. The trial court granted Fernando's motion for partial summary judgment and ordered Appellants to provide a full and

complete accounting of all transactions, revenues, and expenses of PPG and KCE to Fernando.

On May 8, 2018, Fernando filed the joinder complaint against Signature Community Management, LLC, Signature Community Investment Group, LLC., and Jekogian (collectively "Signature Defendants"). In the joinder complaint, Fernando raised claims, including (1) intentionally fraudulent transfer in violation of the Pennsylvania Voidable Transactions Act; and (2) constructively fraudulent transfer in violation of the Pennsylvania Voidable Transactions Act. The Signature Defendants filed an answer to the joinder complaint with new matter and a crossclaim against Luis. The Signature Defendants argued that if the Signature Defendants are held liable to Fernando, Luis or the other defendants would be liable to the Signature Defendants. Luis filed a reply to the new matter and a crossclaim against the Signature Defendants, arguing (1) an intentionally fraudulent transfer in violation of the Pennsylvania Voidable Transactions Act; and (2) a constructively fraudulent transfer in violation of the Pennsylvania Voidable Transactions Act.

The case proceeded to a bench trial. The trial court held an in-person trial between November 12, 2019, and November 14, 2019. The parties then attempted to settle the matter and the trial court continued the trial at the parties' request. On November 2, 2020, Appellants filed a motion to stay conclusion of trial until the parties could proceed in person. The trial court

denied the motion. On July 12, 2021, the bench trial resumed via Zoom and continued until July 14, 2021. Ultimately, on December 13, 2021, the trial court found in favor of the Cozzas, wherein each brother received $1,512,913 for loss of properties and $466,666.66 for loss of cash during refinancing.

Appellants filed a timely motion for post-trial relief. The trial court held a hearing on the motion. On April 22, 2022, the day the motion was denied by operation of law,[3] Appellants filed a notice of appeal. This Court subsequently entered a show-cause order directing Appellants to praecipe the trial court to enter judgment. Judgment was entered on June 21, 2022.[4]

_____

[3] ***See Melani v. Nw. Eng'g, Inc.***, 909 A.2d 404, 405 (Pa. Super. 2006) (noting that when post-trial motion is timely filed, the motion is considered "denied by operation of law one hundred and twenty days after the filing of the motion."). Notably, the trial court entered a separate order and opinion denying the post-trial motion on June 14, 2022.

[4] In a civil case, an appeal "can only lie from judgments entered subsequent to the trial court's disposition of any post-verdict motions, not from the order denying post-trial motions." ***Johnston the Florist, Inc. v. TEDCO Const. Corp.***, 657 A.2d 511, 514 (Pa. Super. 1995) (*en banc*) (citation omitted); ***see also Angelichio v. Myers***, 110 A.3d 1046, 1048 (Pa. Super. 2015) ("As a general rule, this Court has jurisdiction only over appeals taken from final orders."). However, when a notice of appeal is filed prior to the entry of a final judgment, appellate jurisdiction may be perfected by the entry of judgment on the docket. ***See Johnston the Florist***, 657 A.2d at 513; ***see also*** Pa.R.A.P. 905(a)(5) ("A notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof."). Despite Appellants' premature notice of appeal, we will consider the appeal properly taken from the entry of judgment and have changed the docket accordingly. ***See Johnston the Florist, Inc.***, 657 A.2d at 514-15 (stating that appellate courts may "regard as done that which ought to have been done." (citations omitted)).

Appellants raise the following questions for our review:

A. Whether the trial court erred as a matter of law and/or abused its discretion by requiring Appellants to conduct their case-in-chief virtually when [the Cozzas] each received the opportunity to present their case-in-chief in person?

B. Whether the trial court erred as a matter of law and/or abused its discretion by improperly admitting hearsay evidence?

C. Whether the trial court erred as a matter of law and/or abused its discretion by admitting evidence from [the Cozzas] with a prejudicial impact that outweighed any probative value while precluding evidence from Appellant[s] with probative value that outweighed any prejudicial impact?

D. Whether the trial court erred as a matter of law and/or abused its discretion by permitting [the Cozzas] to pursue claims that fell outside the applicable statute of limitations?

E. Whether the trial court erred as a matter of law and/or abused its discretion by rendering a decision against the weight of the evidence?

Appellants' Brief at 5 (some capitalization omitted).

In their first claim, Appellants contend that the trial court erred in forcing them to conduct their case virtually over Zoom while the Cozzas were permitted to present their case-in-chief in person. *See* Appellants' Brief at 15. According to Appellants, the order to conduct virtual testimony violated their due process right to have a meaningful right to be heard. *See id.* Appellants argue that their "witnesses were not given the same equal opportunity as [the Cozzas'] witnesses to be heard, analyzed, and assessed in-person by the [t]rial [c]ourt." *Id.* Appellants note that although rules relating to domestic relations matters permit testifying by electronic means, they claim that there

is no rule in Philadelphia County allowing for such testimony in a civil trial. *See id.* at 15-16. Moreover, while conceding the unprecedented circumstances of Covid-19, Appellants maintain that there was no good cause or compelling reason to force them to present their case over Zoom. *See id.* at 16. Appellants highlight that their witnesses were not high-risk individuals and that the Philadelphia Court of Common Pleas had reopened for many matters at that time. *See id.* at 16-17. Appellants seek a reversal of the trial court's verdict or a new trial. *See id.* at 17-18.

"A question regarding whether a due process violation occurred is a question of law for which our standard of review is *de novo* and the scope of review is plenary." *Reitz v. Flower*, 245 A.3d 723, 727 n.3 (Pa. Super. 2021) (citation omitted). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (citations and internal quotation marks omitted). Accordingly, "due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *In re R.D.*, 739 A.2d 548, 554 (Pa. Super. 1999) (citation and brackets omitted).

To understand the circumstances leading to disparate means of hearing testimony, we must recount the First Judicial District of Pennsylvania's response to the Covid-19 pandemic. On July 2, 2021, the Pennsylvania Supreme Court granted the request from the President Judge of the First

Judicial District, providing, in part, for the authorization of expanded use of advanced communication technology ("ACT") to conduct court proceedings due to the COVID-19 public health emergency in Philadelphia County. ***See*** Order (21 EM 2020), 7/2/21 (granting "the President Judge's request to continue … any procedural rules related to the use of [ACT] … in court proceedings, through August 31, 2021."). Thereafter, the First Judicial District entered an order relating to various trials, stating as follows with regard to civil non-jury trials — "Consistent with the availability of judicial resources including courtrooms not already in use for in-person civil jury trials, civil non-jury trials shall proceed in-person as of September 1, 2021. Prior to September 1, 2021, civil non-jury trials shall continue via [ACT], unless otherwise ordered." Order, 24 of 2021 In re: Expansion of Court Operation, at 2 (Civil Non-Jury Trials).

The trial court conducted the Zoom portion of the trial between July 12 and 14, 2021, well within the dates allowed by the Pennsylvania Supreme Court and the Philadelphia County Court of Common Pleas to conduct ACT trials due to the Covid-19 emergency. Here, all the parties participated in the ACT hearing, and Appellants were able to examine and cross-examine the various witnesses and do not identify any specific prejudice that resulted. ***See Mathews***, 424 U.S. at 334. In fact, Appellants do not dispute that they were able to observe the witnesses' demeanor and body language during examination.

- 12 -

Importantly, Appellants have not established that the trial judge was unable to understand the witnesses' testimony through videoconferencing. Given the availability of contemporaneous videoconference technology through Zoom for receiving the outstanding testimony, Appellants have not established they were denied an opportunity to present evidence at a meaningful time or in a meaningful manner. Their first claim is without merit.

In their second claim, Appellants contend the trial court abused its discretion in admitting hearsay statements at trial. *See* Appellants' Brief at 18, 22. Appellants argue that the Cozzas introduced hearsay from several non-participating witnesses over objection, which the trial court improperly considered in reaching its verdict. *See id.* First, Appellants assert that Linda Warburton, a Vice President at Signature, testified at trial she learned from Art Jimenez, an executive at Signature, that Jekogian had other responsibilities that had to be paid and were impacting funding. *See id.* at 18, 20-21. Appellants claim that this testimony was presented to suggest that Jekogian was redirecting money from PPG and KCE for his own benefit. *See id.* at 21. Appellants further argue that Warburton improperly testified that Al Lord, an investor, questioned the KCE financials and "wanted answers or someone is going to go to jail." *Id.* at 19 (citation omitted). Appellants note that Lord, who was not a partner in KCE, did not testify, they could not cross-examine him, and the trial court inappropriately relied on this testimony. *See id.* Finally, Appellants claim the trial court improperly allowed Luis to testify

that Brian Kroker, Jekogian's asset manager, told Luis to contribute capital to KCE. ***See id.*** Appellants conclude these errors required a reversal of the verdict or a new trial. ***See id.*** at 22.

> Admission of evidence is within the sound discretion of the trial court and a trial court's rulings on the admission of evidence will not be overturned absent an abuse of discretion or misapplication of law. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

> To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.... A party suffers prejudice when the trial court's error could have affected the verdict.

***Schuenemann v. Dreemz, LLC***, 34 A.3d 94, 100–101 (Pa. Super. 2011) (quotation marks and citations omitted).

Hearsay is a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c). Hearsay is inadmissible "except as provided by [the Rules of Evidence], by other rules prescribed by the Pennsylvania Supreme Court, or by statute." Pa.R.E. 802; ***see also Adams v. Rising Sun Med. Ctr.***, 257 A.3d 26, 35 (Pa. Super. 2020) ("Generally, hearsay is inadmissible because it is deemed untrustworthy since it was not given under oath and subject to cross-examination.").

Here, Warburton testified to the following about Jimenez:

[Counsel for Fernando]. Okay. And did you get an explanation from him as to why these monies were being pulled out?

[Warburton]. Yes, I did.

[Counsel for Fernando]: What was his explanation?

[Appellants' counsel]: Objection. Hearsay.
…
THE COURT: I'll sustain the objection, but you certainly can give your response or your understanding of what the situation was after talking to Mr. Jimenez. …

[Warburton]: That there were other responsibilities that pertained to Mr. Jekogian, personally, that had to be taken care of by the sixth of every month.

N.T., 11/12/19, at 184-86.

In its opinion addressing Appellants' post-trial motion, the trial court indicated that it did not consider this testimony. *See* Trial Court Opinion, 6/14/22, at 10; *see also In re M.J.M.*, 858 A.2d 1259, 1262 (Pa. Super. 2004) ("When the court is sitting as the finder of fact, it is presumed that inadmissible evidence is disregarded and that only relevant and competent evidence is considered."); *Commonwealth v. Dent*, 837 A.2d 571, 582 (Pa. Super. 2003) (noting that we presume that a judge, sitting as finder of fact in a non-jury trial, has disregarded any inadmissible hearsay). The trial court specifically found that it relied upon documents in the Dropbox, which established that the collected rents had disappeared. *See* Trial Court Opinion, 6/14/22, at 10. To that end, Warburton testified that the executive level of Signature had access to documents relating to accounting and expenses of the properties through Dropbox or Google Docs. *See* N.T., 11/12/19, at 187-

88; *see also* N.T., 11/13/19, at 140-42, 144-48, 156-57 (wherein Fernando testified that documents, including K-1s, found in the Dropbox showed that Jekogian transferred his interests in the LLCs owning the various properties to the trusts). Appellants did not object to Warburton's testimony with regard to the documents in Dropbox. *See* N.T., 11/12/19, at 188. In light of the foregoing, Appellants' argument that the court abused its discretion by considering Jimenez's hearsay testimony fails. *See Schuenemann*, 34 A.3d at 101.

Next, we will address Warburton's testimony that Lord had stated that "I will not be screwed over again, and he said, if I don't get answers, someone is going to jail." N.T., 11/12/19, at 196. Appellants objected to this testimony, and the trial court overruled the objection. *See id.* at 196-97. The trial court found that this "testimony was not presented to prove the truth of the matter presented." Trial Court Opinion, 6/14/22, at 11.

We agree with trial court's conclusion and find that this testimony was not presented to establish that anyone would go to prison. *See Castellani v. Scranton Times, L.P.*, 124 A.3d 1229, 1244 (Pa. 2015) ("A statement that is not offered for its truth, however, is not hearsay." (citation omitted)). In fact, Warburton's testimony in this regard was presented to articulate that the investors in the properties, not related to the properties at issue in this case, were upset with the management of the properties. *See* N.T., 11/12/19, at 194-98; *see also* N.T., 3/11/22, at 13-14 (wherein Appellants' counsel stated

that Lord's statements were related to a separate property). Moreover, Appellants seem to concede that the trial court did not make any direct reference to these statements in reaching its verdict. *See* N.T., 3/11/22, at 15 ("With respect to [] Lord, it's inherent in the decision that – admittedly Your Honor, there wasn't a direct reference to the [trial c]ourt saying that"); *see also Schuenemann*, 34 A.3d at 101. Accordingly, Appellants are due no relief on this claim.

Finally, we will address Appellants' claim that the trial court improperly admitted Kroker's out-of-court statements. Relevantly, "where the statement is being offered to show its effect on a listener, it is not being offered for the truth of the matter and is non-hearsay." *Schmalz v. Manufacturers & Traders Tr. Co.*, 67 A.3d 800, 803 n.3 (Pa. Super. 2013).

Here, the trial court specifically sustained Appellant's objection to the out-of-court statements, and limited Luis's testimony to his own understanding of his conversation with Kroker. *See* N.T., 7/12/21, at 44-47. Thereafter, Luis testified that his understanding of his conversation with Kroker was that Kroker was seeking capital support for the company. *See id.* at 46, 47. Under these circumstances, the testimony was not inadmissible hearsay. *See Schmalz*, 67 A.3d at 803 n.3. Importantly, Appellants fail to establish that the admission of this statement affected the verdict. *See* Trial Court Opinion, 6/14/22, at 12 (noting that Appellants failed to show that the trial court cited to these statements or affected its decision); *see also*

*Schuenemann*, 34 A.3d at 101. In light of the foregoing, Appellants' second claim is without merit.

In their third claim, Appellants contend that the trial court abused its discretion in admitting the Cozzas' evidence and precluding certain evidence Appellants sought to admit at trial. *See* Appellants' Brief at 22, 26-27. Appellants maintain the Cozzas' evidence had no probative value or was highly prejudicial and their own evidence was highly relevant and probative and the Cozzas would not have suffered prejudice had the evidence been introduced. *See id.* at 27. Appellants assert the trial court improperly weighed the Cozzas' evidence in rendering its verdict, and the trial court's decision should be vacated or there should be a new trial. *See id.* at 23-24, 27.

> Admissibility [of evidence] depends on relevance and probative value. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact. Evidence, even if relevant, may be excluded if its probative value is outweighed by the potential prejudice. … The function of the trial court is to balance the alleged prejudicial effect of the evidence against its probative value and it is not for an appellate court to usurp that function.

*Klein v. Aronchick*, 85 A.3d 487, 498 (Pa. Super. 2014) (citations and quotation marks omitted).

Initially, we address Appellants' claims regarding the admission of the Cozzas' evidence. First, Appellants claim the trial court improperly allowed the Cozzas to introduce unauthenticated K-1 and other tax documents of entities

unrelated to the instant case, and these documents were used to damage Jekogian's credibility. *See* Appellants' Brief at 22-23.

The trial court addressed Appellants' claim as follows:

Here, it is established that [the pertinent exhibits] are relevant to the [Cozzas'] claims for fraudulent transfer. The [Cozzas] are entitled to present the evidence for their claims. To have the evidence excluded, [the exhibits] should be more than merely detrimental to [Appellants'] case. The evidence should have an undue tendency to suggest that a decision that the transfer was fraudulent would be made on an improper basis or that the exhibits would divert the [trial c]ourt's attention away from the duty of weighing the evidence impartially.

Here, the [trial c]ourt found that the evidence shows a pattern of transfers that occurred to several properties simultaneously and systematically. There was no reason the [trial c]ourt should suspect that the evidence would cause the [trial c]ourt to determine the issue of the transfer on an improper basis. Accordingly, the [trial c]ourt concludes that the admission of [the exhibits] was in compliance with the Pennsylvania Rules of Evidence.

Trial Court Opinion, 6/14/22, at 14-15.

We agree and conclude that the trial court did not abuse its discretion in admitting the documents. *See id.* The Cozzas sought introduction of the documents to establish that Jekogian transferred his assets into the trusts. *See* N.T., 11/13/19, at 140-42, 144-48, 156-57. Importantly, Jekogian acknowledged the transfers into the trusts. *See* N.T., 11/14/19, at 80-106. Although the documents contained companies and properties not at issue in this appeal, the totality of the evidence established a common purpose or design in the transfer of Jekogian's interest in various companies owning properties to the trusts. Therefore, we conclude that the documents were

probative of the Cozzas' claims that Appellants had fraudulently transferred funds from the properties in question to trusts controlled by Jekogian and his father.

Further, Appellants have not established prejudice where the trial court, sitting without a jury, would be able to hear the evidence presented and properly consider the relevant evidence. **See** Trial Court Opinion, 6/14/22, at 14-15; **see also Krishnan v. Cutler Group, Inc.**, 171 A.3d 856, 898 (Pa. Super. 2017) (rejecting claim that admission of evidence would be unduly prejudicial where, the trial court, as the finder of fact, would be able to "weigh its probative value and properly consider it only for the purpose for which it is relevant and presented.").

Finally, Appellants baldly argue that the K-1 and tax documents and the draft and incomplete financial records were not properly authenticated, without providing any pertinent analysis or citation to case law or the evidentiary rules; accordingly, this claim is waived on appeal. **See In re Estate of Whitley**, 50 A.3d 203, 209 (Pa. Super. 2012) (stating that an argument that fails to cite to relevant case or statutory authority "constitutes waiver of the claim on appeal."); **see also** Pa.R.A.P. 2119(a) (stating that the argument should include "such discussion and citation of authorities as are deemed pertinent."). Considering the foregoing, the trial court did not abuse its discretion in admitting this evidence.

Next, Appellants claim the trial court abused its discretion in admitting irrelevant evidence of the purported value of properties at issue in 2015 when the properties were foreclosed in 2012 and the properties would have been refinanced before 2015. **See** Appellants' Brief at 23. Here, Appellants merely speculate and do not establish the trial court considered this sales figure in awarding judgment or calculating damages for the Cozzas. **See** Trial Court Opinion, 6/14/22, at 16 (stating that "neither the 2015 sale value nor the documents were used by the [trial c]ourt in rendering a decision."). Therefore, Appellants do not demonstrate that they suffered prejudice, and this claim is without merit. **See Reott v. Asia Trend, Inc.**, 7 A.3d 830, 839 (Pa. Super. 2010) (noting that a party suffers prejudice when the trial court's admission of evidence affected the verdict).

Next, Appellants baldly argue that the trial court permitted the Cozzas' expert, Stephen J. Scherf, to reference materials and information not considered in the expert report. **See** Appellants' Brief at 23-24. However, Appellants do not cite to the extraneous information or materials considered by Scherf or establish that the trial court utilized such information in rendering its verdict. Therefore, Appellants have waived their claim. **See In re Estate of Whitley**, 50 A.3d at 209; **see also** Pa.R.A.P. 2119(a).

Additionally, Appellants claim that the probative value of the documents admitted showing the value of the trusts was outweighed by the prejudice they suffered. **See** Appellants' Brief at 24. Notably, the trial court explicitly

stated that it did not consider these trust documents in rendering its decision. *See* Trial Court Opinion, 6/14/22, at 16; *see also Reott*, 7 A.3d at 839. Moreover, at trial, the parties appeared to agree that these documents were introduced to impeach Jekogian's testimony. *See* N.T., 11/14/19, at 193-95 (wherein Appellants' counsel objected when the Cozzas attempted to use the documents beyond impeachment purposes and the trial court sustained this objection). In light of the foregoing, we conclude Appellants were not prejudiced and the trial court did not abuse its discretion in admitting the documents.

We now turn to Appellants' claims that the trial court abused its discretion in excluding their evidence. *See* Appellants' Brief at 24-26. First, Appellants claim that the trial court abused its discretion in precluding them from introducing additional documents identified in their amended pre-trial memorandum. *See id.* at 24. Specifically, Appellants sought to introduce (1) loan and other pertinent documents relating to refinancing the KCE properties; (2) email correspondence with Luis about the struggles faced by KCE, establishing his knowledge of the financial situation of the company and his attempt to save the company; (3) documents relating to the foreclosure and potential refinancing of the properties; and (4) KCE corporate records.[5]

---

[5] We note that Appellants did not cite these four documents in their post-trial motion. "Rule 227.1 requires parties to file post-trial motions in order to preserve issues for appeal, and if an issue has not been raised in a post-trial

*(Footnote Continued Next Page)*

Notably, the trial court did not exclude Appellants' proffered evidence pursuant to the Rules of Evidence. Rather, the court precluded the evidence because it had not been identified in Appellant's original pre-trial statement. "The purpose of a pre-trial statement is to prevent surprise." *Wiley v. Snedaker*, 765 A.2d 816, 817-18 (Pa. Super. 2000). Under our Rules of Civil Procedure, Appellants were required to file any pre-trial memorandum no later than 30 days before the earliest trial date. *See* Pa.R.C.P. 212.1(b)(2).[6]

Here, the week before trial began in November 2019, Appellants filed their amended pre-trial memorandum.[7] In response, the Cozzas attempted to

_____

motion, it is waived for appeal purposes." *Bd. of Supervisors of Willistown Twp. v. Main Line Gardens, Inc.*, 155 A.3d 39, 44 (Pa. 2017) (citation, quotation marks, and brackets omitted). While Appellants' post-trial motion is deficient, we will address their claim.

[6] While Rule 212.1 applies to civil actions to be tried by a jury, courts "by local rule may extend Rules 212.1 and 212.2 to apply to actions to be tried non-jury as well as by jury[.]" Pa.R.C.P. 212.1, note. Philadelphia County Rule 212.1 states that "pre-trial statements shall be filed as required in a case's applicable Program Case Management Order." Phila.Civ.R. 212.1(B). Here, the trial court explicitly stated that this case was conferenced pursuant to Pa.R.C.P. 212. *See* Order, 9/10/19; *see also* Order, 6/25/15 ("It is expected that the case will be ready for trial [date], which is the earliest trial date pursuant to Pa.R.C.P. 212.1 ....").

[7] The reproduced record includes an order entered by the trial court for a pre-trial conference, which stated, in part, that "Counsel should expect any exhibit not listed to be precluded at trial." Order, 6/13/19, at 1. However, this order has not been included in the certified record; therefore, we cannot consider it. *See Brandon v. Ryder Truck Rental, Inc.*, 34 A.3d 104, 106 n.1 (Pa. Super. 2011) ("Any document which is not part of the official certified record is considered to be nonexistent, which deficiency may not be remedied by inclusion in the reproduced record."(citation omitted)).

file a supplemental expert report, in which Scherf stated that he did not change his opinion based upon the new documents identified in Appellants' amended pre-trial memorandum. **See** N.T., 11/14/19, at 6, 9-10. Appellants objected to the introduction of Scherf's supplemental report as being untimely filed. **See id.** at 5, 6. The Cozzas responded that "the lateness of [Scherf's supplemental] report is piggybacked on the lateness of the pretrial statement filed by [Appellants] late last week." **Id.** at 5. Ultimately, the trial court excluded both the documents sought to be introduced by Appellants and the supplemental expert report sought to be introduced by the Cozzas. **See id.** at 15.

Preliminarily, Appellants' amended pre-trial memorandum was filed late. Since these new exhibits were not identified in Appellant's timely pre-trial statement, the trial court had the duty to treat them as a violation of Pa.R.C.P. 212.2(a)(4) ("a list of all exhibits which a party intends to use at trial"), and therefore impose a penalty for noncompliance under Pa.R.C.P. 212.2(c). **See Estate of Ghaner v. Bindi**, 779 A.2d 585, 589 (Pa. Super. 2001) (noting that the imposition of a sanction is mandatory where a trial court finds non-compliance with Rule 212(a)). Penalties include preclusion of any exhibits not listed in the timely pre-trial statement. **See** Pa.R.C.P. 212(c)(2).

While Appellants do not discuss **Estate of Ghaner**, we acknowledge that, there, this Court reversed the penalty imposed by the trial court. Specifically, the **Estate of Ghaner** panel concluded that the trial court's

decision to preclude the plaintiff's proffered evidence was "tantamount to a dismissal of [the] action." **Estate of Ghaner**, 779 A.2d at 589. This sanction was deemed too severe for the plaintiff's singular violation. **See id.** at 590.

In contrast, the preclusion of Appellants' proffered evidence does not constitute a complete dismissal of Appellants' defenses. Further, Appellants fail to demonstrate why their late filings should have been admitted but the Cozzas' responsive filing should have been excluded. Accordingly, Appellants have not established the trial court abused its discretion in choosing the exclusion of the late filings of both parties.

Next, Appellants argue that the trial court should have admitted various organizational documents. **See** Appellants' Brief at 25. Specifically, Appellants claim that the documents would have demonstrated that the Cozzas agreed to the structure of the companies, including the movement of monies between accounts. **See id.**

Here, Appellants only cite to the organizational documents relating to NWJ Companies, which they concede was admitted to rebut Luis's testimony. **See id.**; **see also** N.T., 7/12/21, at 88-89. However, despite the voluminous nature of the certified record, the trial court notes that Appellants do not cite to any place in the record where they sought the introduction of any other documents. **See** Trial Court Opinion, 6/14/22, at 16. Appellants have not cured this defect in their brief. Therefore, Appellants have not preserved the claim on appeal. **See** Pa.R.A.P. 2117(c) (where an issue is not reviewable

unless raised or preserved below, an appellate brief must set forth specific references to the places in the record where "the question was timely and properly raised below so as to preserve the question on appeal."); *see also* Pa.R.A.P. 2119(a).

Appellants also assert that the trial court should have allowed them to introduce tax returns involving the parties. *See* Appellants' Brief at 25-26. Appellants maintain the returns constituted direct evidence of the values of the various properties and their profitability. *See id.* at 25. Appellants claim that the trial court failed to determine the probative value of the evidence or conduct an undue prejudice analysis. *See id.*

Again, the trial court observes that Appellants fail to cite to any place in the record where they sought the introduction of these tax returns. *See* Trial Court Opinion, 6/14/22, at 16. Instead, Appellants merely cite to an exhibit by the Cozzas which demonstrates the summary of reported income on K-1s to Fernando and argue that this exhibit supports their position. *See* Appellants' Brief at 25. Appellants neglect to argue how this summary establishes that the trial court abused its discretion. Accordingly, this claim is waived. *See* Pa.R.A.P. 2117(c).

Finally, Appellants argue that the trial court abused its discretion in not allowing Katerina Cozza ("Katerina"), Fernando's ex-wife, to testify. *See* Appellants' Brief at 26. According to Appellants, Katerina was involved in

implementing a strategy to blame Appellants and avoid tax liability associated with losses suffered by the properties. *See id.*

Here, counsel for Fernando asked the trial court whether Katerina could attend the zoom trial. *See* N.T., 7/12/21, at 6. Appellants' counsel objected, stating that Katerina was a possible rebuttal witness. *See id.* at 7-8. Fernando's counsel pointed out that Appellants had not subpoenaed Katerina to testify and she was not prepared to testify. *See id.* at 8-9. The trial court overruled the objection and permitted Katerina to attend the trial. *See id.* at 10. However, the trial court allowed Appellants to "reassert argument about a rebuttal witness at a later date[.]" *Id.* Appellants did not raise any claim regarding calling Katerina after this time. Accordingly, we conclude that this claim is waived. In light of the foregoing, Appellants' third claim is without merit.

In their fourth claim, Appellants contend that the trial court erred by permitting the Cozzas to pursue their claims against the Signature Defendants despite failing to raise them within the applicable statute of limitations. *See* Appellants' Brief at 28. Appellants note that the Signature Defendants were not joined as parties until May 8, 2018, in the joinder complaint. *See id.* According to Appellants, the counts raised in that complaint — intentionally fraudulent transfer and constructively fraudulent transfer — were subject to a statute of limitations of four years, and the relevant fraudulent actions occurred in 2012, six years before the filing of the complaint. *See id.* Further,

Appellants contend that they preserved this claim, by raising it in their new matter. *See id.* at 28-29.

> A statute of limitations defense is generally raised in new matter. Pennsylvania is a fact-pleading jurisdiction. The material facts upon which a defense is based shall be stated in a concise and summary form. While our rules require the pleading of all material facts upon which claims, and defenses, are based, there is no requirement to plead the evidence upon which the pleader will rely to establish those facts.
>
> The statute of limitations is an affirmative defense which must be specifically pleaded, or the defense is waived. An affirmative defense, including a statute of limitations defense, may not be raised by general averment but, rather, must be supported by factual allegations sufficient to give rise to the affirmative defense.

*El-Gharbaoui v. Ajayi*, 260 A.3d 944, 962-63 (Pa. Super. 2021) (citations, brackets, and quotation marks omitted); *see also* Pa.R.C.P. 1030(a) (stating that, "all affirmative defenses including but not limited to the defenses of ... statute of limitations ... shall be pleaded in a responsive pleading under the heading 'New Matter'").

Relevantly, in their answer and new matter to Fernando's joinder complaint, the Signature Defendants averred as follows: "The Plaintiff's claims may be barred by the statute of limitations and the statute of frauds." Answer and New Matter, 6/28/18, at 12. Here, the Signature Defendants did not plead the statute of limitations defense with sufficient specificity. Therefore, the statute of limitations defense is waived. *See El-Gharbaoui*, 260 A.3d at 963 (concluding that the statute of limitations defense was waived where the averment that the appellant "raises the affirmative defense of the statute of

limitations" failed to comply with Pa.R.C.P. 1030(a) because the single, threadbare declaratory statement "did not convey the factual underpinnings upon which his statute of limitations defense rested.").[8]

In their final claim, Appellants contend that the verdict was against the weight of the evidence, as the totality of the evidence allegedly heavily favored their conclusions. *See* Appellants' Brief at 29. Appellants argue that the Cozzas were aware the properties in question were not profitable, highlighting that the losses were reported on the K-1 statements, Luis was involved in seeking refinancing and equity options for the properties, and Luis kept Fernando informed about the investment and potential foreclosure. *See id.* at 29-31. Additionally, Appellants assert the aggregate account, through which the funds flowed from the various accounts tied to the properties, was used for a brief period and all the relevant properties were fully reconciled. *See id.* at 31.

According to Appellants, the Cozzas were fully aware of the structure of the movement of payments between different accounts, noting the NWJ Companies organizational policy set forth this banking structure and this is commonly used method in the industry. *See id.* at 31-33. To that end, Appellants emphasize the Cozzas have not established Appellants siphoned

---

[8] We also note that Appellants do not identify where they raised the issue of the statute of limitations for a decision by the trial court. Their inclusion of the issue in their Answer and New Matter did not place the issue before the trial court for a ruling.

funds from the properties to the trusts, and instead only offered speculative testimony and a single bank statement as proof. *See id.* at 33-34, 35. Appellants maintain the Cozzas conspired with their accountants to concoct their claim that Jekogian stole the money to overcome their own tax liabilities. *See id.* at 33. Additionally, Appellants claim that Scherf's expert testimony on behalf of the Cozzas was flawed and the trial court should not have relied on this testimony to calculate the damages. *See id.* at 34-35.

"When reviewing a verdict in a non-jury trial, this Court will respect a trial court's findings with regard to the credibility and weight of the evidence unless the appellant can show that the trial court's determination was manifestly erroneous, arbitrary and capricious, or flagrantly contrary to the evidence." *El-Gharbaoui*, 260 A.3d 965 (citation, quotation marks, and brackets omitted). "Questions of the weight of the evidence are solely the province of the fact-finder—here, the trial court—who is free to believe or to disbelieve any evidence it chooses. We cannot and will not re-weigh the evidence nor re-assess the credibility of the witnesses." *Ferraro v. Temple Univ.*, 185 A.3d 396, 406 (Pa. Super. 2018) (citation omitted). "The test is not whether this Court would have reached the same result on the evidence presented, but rather, after due consideration of the evidence the trial court found credible, whether the trial court could have reasonably reached its conclusion." *El-Gharbaoui*, 260 A.3d at 965-66 (citation omitted).

Here, Jekogian admitted that money in the PPG and KCE accounts was transferred to Signature Management or other affiliates. **See** N.T., 7/13/21, at 137-38, 140. However, Jekogian insisted that having an aggregate sweep account was a common occurrence in the real estate business. **See id.** at 138. Nevertheless, Fernando testified that he did not know about the commingling until the properties were lost to foreclosure in 2013. **See** N.T., 11/13/19, at 83-84, 87. Likewise, Luis indicated that he did not know about the commingling of funds. **See** N.T., 7/12/21, at 56-57; **see also id.** at 42-43 (wherein Luis testified that Jekogian controlled the bank accounts, accounting records, and rents of KCE, and that the Cozzas had no control over anything).

Furthermore, Bobbi Wright, an accountant and property manager at Signature Management, testified that Signature Management commingled funds from various properties, despite the properties having different investors. **See** N.T., 11/12/19, at 84-88; **see also id.** at 88 (labeling the commingling of funds as an "accounting mess"). In fact, Warburton and Wright testified that they were directed to provide Luis only limited information. **See** N.T., 11/13/19, at 23, 26; N.T., 11/12/19, at 135; **see also** N.T., 11/13/19, at 26-27, 30, 61-62 (Warburton testifying that information about the commingling of funds would not be apparent to anyone reading reports provided by Signature, and that information provided to Luis did not give a clear picture of what was really happening with the funds).

Moreover, Warburton testified that between 2010 and 2011, the properties were operating with a profit, but the only problem was the money was being swept out of the accounts. *See* N.T., 11/13/19, at 33-34. Warburton indicated she was directed to stop making mortgage payments because funds had been moved into the aggregate accounts. *See id.* at 34. Due to the frequent transfers, the properties struggled to pay repair bills and keep the utilities on, and the companies had no credit. *See* N.T., 11/12/19, at 103-08, 120-21. Further, between 2011 and 2013, Jekogian transferred his ownership interests of the LLCs owning the properties to the trusts. *See* N.T., 11/13/19, at 140-42, 144-48, 156-57.

In 2013, the properties were lost to foreclosure. *See id.* at 75; *see also* N.T., 7/12/21, at 58. Luis indicated he was not involved in the decision to proceed to foreclosure. *See* N.T., 7/12/21, at 117, 150. Similarly, Fernando testified that he was not aware of the nonpayment of mortgage or the appointment of the receiver. *See* N.T., 11/13/19, at 138-40. As a result of the foreclosure, Fernando lost the assets and equity of the properties, and Luis lost his investments. *See* N.T., 7/12/21, at 59; N.T., 11/13/19, at 164.

Further, Scherf, the Cozzas' expert witness, testified that the losses to the Cozzas would have been $1,512,913 for loss of properties. *See* N.T., 11/14/19, at 22, 43-45, 53. Additionally, when the parties refinanced with Prudential in 2005, they had approximately $1.4 million remaining after

paying the mortgages; however, the Cozzas did not receive any portion of this money. **See** N.T., 7/12/21, at 48-49, 93; N.T., 11/13/19, at 78-79.

Ostensibly, Appellants' arguments request a reassessment of the witnesses' credibility and reweighing the evidence in a light most favorable to them to reach a different result. We decline Appellants' invitation to do so, as the trial court, the fact-finder in this case, resolved the credibility of the witnesses and assessed the conflicts in evidence, and this Court is not permitted to re-examine those determinations or substitute our judgments for those of the trial court. **See Ferraro**, 185 A.3d at 406. Here, the trial court specifically found Luis and Warburton credible and Jekogian to be not credible. **See** Trial Court Opinion, 6/14/22, at 19-20; Trial Court Opinion, 12/13/21, at 44. In fact, the trial court found Jekogian's testimony was "often inconsistent, evasive, or incorrect." Trial Court Opinion, 12/13/21, at 44. Additionally, the trial court noted that the expert report by Scherf was undisputed. **See** Trial Court Opinion, 12/13/21, at 18; **see also** N.T., 11/14/19, at 53 (Appellants proferring no objection to the admission of Scherf's expert report into evidence).

Here, the evidence credited by the trial court established that Luis did not manage or participate in the financial management of the properties or make any decisions regarding the commingling of funds or the foreclosure of the properties. Furthermore, Appellants do not cite to any report rebutting Scherf's calculation of damages or establish that Scherf miscalculated the

damages. **See** Pa.R.A.P. 2119(a). Moreover, Appellants fail to dispute that the Cozzas were entitled to one-third each of the leftover $1.4 million from refinancing. Based upon the record before us, we discern no abuse of discretion on the part of the trial court based upon Appellants' claim that the verdict was against the weight of the evidence. **See El-Gharbaoui**, 260 A.3d at 966. Therefore, Appellants' claim is without merit.

As we conclude none of Appellants' claims merit relief, we affirm the judgment.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/25/2023