J-A16034-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| ANYAE MATTHEWS, INDIVIDUALLY AND AS PARENT AND AS NATURAL GUARDIAN OF K.B. A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | |
| v. | : : : | No. 1163 EDA 2024 |
| HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA, TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, PENN MEDICINE, DANIELLE BURKLAND, M.D., AND ALLISON E. MYERS, M.D. | : : : : : : | |

Appeal from the Judgment Entered April 11, 2024
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  201201171

BEFORE:  LAZARUS, P.J., KUNSELMAN, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED FEBRUARY 26, 2026**

Appellant, Anyae Matthews, individually and as the parent and natural guardian of K.B., a minor, appeals from the judgment entered in the Philadelphia County Court of Common Pleas, in favor of Appellees, the Hospital of the University of Pennsylvania, Trustees, of the University of Pennsylvania, Penn Medicine, Danielle Burkland, M.D., and Allison E. Myers, M.D., in this medical malpractice action.  We affirm.

The relevant facts and procedural history of this matter are as follows. On December 30, 2017, due to Appellant's failure to progress in labor and K.B.'s fetal heart rate, K.B. was born via cesarean section ("c-section") at the

Hospital of the University of Pennsylvania. Several months after K.B.'s birth, Appellant noticed that K.B. lacked a full range of movement in the left side of her body and brought her to the pediatrician for examination. Further imaging revealed certain abnormalities in K.B.'s brain, namely, polymicrogyria, a porencephalic cyst, and missing tissue on both sides of the brain.[1] Additionally, there was evidence that she had suffered a stroke. As a result of the aforementioned abnormalities, K.B. lives with various disabilities, including but not limited to the partial paralysis of the left side of her body.

On December 21, 2020, Appellant filed a complaint against Appellees for medical malpractice, claiming that Appellees had acted negligently during Appellant's labor and K.B.'s birth, and that Appellees' actions and inactions had caused K.B.'s brain abnormalities and physical disabilities. Litigation ensued and, on February 5, 2024, the case proceeded to a jury trial.

At trial, Appellant presented the testimony of two expert witnesses.[2] Appellant's first witness, Dr. James Edwards,[3] testified that the attending physicians, Dr. Burkland and Dr. Meyers, deviated from the standard of care

_____

[1] Polymicrogyria is a condition in which the brain develops too many ridges and/or folds, and the ridges are unusually small. A porencephalic cyst is a fluid-filled cavity in the brain which replaces normal brain tissue, and which may be caused either by an injury, or abnormal brain development.

[2] Both Appellant and Appellees presented other evidence and testimony, but as Appellant's issues are primarily related to causation, we summarize the most pertinent testimony herein.

[3] Dr. Edwards testified via remote videotaped deposition, by agreement of the parties, on Saturday, February 10, 2024. A video of the deposition was played for the jury at trial.

by delaying a c-section after monitoring decelerations in K.B.'s fetal heart rate. Dr. Edwards stated that a c-section should have occurred either at 9:49 p.m. or within 20 minutes of that time, and that the latest appropriate time to perform the c-section was "right around 11." (**See** N.T. Trial, 2/10/24, at 29). Dr. Edwards further opined that the doctors' actions fell below the standard of care by not delivering K.B. as soon as they determined that Appellant had developed chorioamnionitis, an infection in the amniotic fluid, which Dr. Edwards explained may increase a risk for developing a brain injury. (**See id.** at 102).[4]

Appellant's second expert witness, Dr. Tiffani McDonough, a pediatric neurologist, opined that K.B. was at a risk for stroke between 9:45 p.m. and 10:00 p.m., based on the fact that her fetal tracings had declined and she was in a state where there was decreased blood flow. (**See** N.T. Trial, 2/12/24, at 77). She further testified that a "perfect storm of events," including a long deceleration and tachycardia, led to the stroke, which resulted in a clot, blocked blood vessel, and stroke. (**See id.** at 99-100). On cross-examination, Dr. McDonough conceded that the stroke was referred to in various medical

_____

[4] We note that Appellant called Dr. Edwards to testify only as an expert regarding the standard of care, and not as an expert on causation. (**See** N.T. Trial, 2/12/24, at 5-6). Appellees objected to this portion of Dr. Edwards' testimony in which Dr. Edwards discussed the risk factors for strokes, as beyond the scope of his expert report. (**See id.** at 6-12). Ultimately, the court allowed the statement because it had been introduced on cross-examination and Dr. Edwards did not specifically opine on causation, only that chorioamnionitis could be a risk factor for developing a brain injury. (**Id.** at 36).

records as an in-utero or peri-natal stroke, which could occur during pregnancy as early as 20 weeks, and that there were no records indicating that a clot had caused the stroke.

Appellees presented the testimony of Dr. Peter Bernstein, a maternal fetal medicine specialist. Dr. Bernstein opined that the care Appellees had provided to Appellant was consistent with the standard of care. Dr. Bernstein testified regarding his belief that K.B.'s injury occurred during the second trimester, while her brain was forming.

Additionally, Dr. Bernstein explained that there was no indication a c-section was necessary at 9:49 p.m. According to Dr. Bernstein, diagnosis of chorioamnionitis is not uncommon in laboring women and does not necessarily present a need for an earlier delivery, as the appropriate treatments are antibiotics, Tylenol, and encouragement to deliver. Dr. Bernstein stated that the fact that K.B. had been born without an infection or any indications of sepsis supported this conclusion.

Further, Dr. Bernstein explained that K.B.'s heart rate shifted between category 1 and category 2, which is normal during labor, but never entered category 3, which would have required an immediate, emergent delivery. Additionally, K.B.'s APGAR[5] scores were both explainable and positive. Dr. Bernstein explained that K.B. had a low APGAR and was not breathing at one

_____

[5] APGAR is a test performed on a baby shortly after birth, which first measures the child's tolerance of the birthing process, and second, how well the child is doing outside of the womb. The test measures breathing effort, heart rate, muscle tone, reflexes, and skin color.

- 4 -

minute after birth, which indicated a need for ventilation but was expected after a c-section. However, K.B. had a normal APGAR at five minutes after birth, which Dr. Bernstein deemed a more important reading.

Appellees also presented the testimony of Dr. Louis Gilbert Vezina as an expert in pediatric neuroradiology and brain abnormality. He testified that, based on imaging, K.B.'s brain was abnormally formed. Dr. Vezina disputed Appellant's claim that a stroke during birth caused K.B.'s brain malformation because a stroke would have resulted in a normally formed brain with a destructive lesion contained within it, which was not so in K.B.'s case. Dr. Vezina testified that the true cause of the damage could be difficult to determine based solely on the imaging, but he opined that regardless of whether K.B. had a genetic defect, had suffered an infection, or ischemic event or other vascular disruption, the damage had occurred during brain development in the second trimester. Finally, Dr. Vezina testified that chorioamnionitis during labor could not have caused K.B.'s abnormalities.

Appellees also presented the testimony of Dr. Jonathan Davis, an expert in neonatology. Dr. Davis testified that K.B.'s specific brain abnormality is usually associated with genetic problems or developmental disorders and may take years to manifest as the brain matures. Dr. Davis denied that K.B.'s specific brain abnormality could have been caused by a stroke shortly before her birth at 39 weeks, particularly where both sides of the brain were affected, as both sides of the brain possess different circulations. Further, Dr. Davis opined that K.B. was missing brain tissue on both sides of her brain, which

could not have been caused by a stroke immediately before birth.

Finally, Appellees presented the testimony of Dr. Steven Pavlakis, an expert in pediatric neurology and the diagnosis of strokes in children. Dr. Pavlakis opined that it was unlikely K.B.'s brain abnormalities were caused by a stroke or other occurrence close to birth but were caused by a developmental disorder around 28 or 29 weeks in utero. According to Dr. Pavlakis, polymicrogyria cannot result due to a stroke. Further, Dr. Pavlakis opined that the lining of the porencephalic cyst also contraindicated a stroke.

Relevant to this appeal, the court denied Appellant's request to provide two jury instructions regarding causation, namely, the "increased risk of harm" charge, which Appellant argued was required because the delay in a c-section increased the risk of harm overall. The court also refused to instruct the jury with two instructions on concurrent causation, instead directing Appellant's counsel to choose between the charges at Suggested Standard Jury Instruction ("SSJI") 13.150 and 7.90.

Further, at the conclusion of trial the court ruled on a pending motion *in limine* regarding Appellant's claim for loss of future wages. Prior to trial, Appellees had argued that Appellant should not be able to present a future lost wages claim to the jury because Appellant had not retained a vocational expert. Appellant asserted that the evidence submitted at trial concerning K.B.'s impairments (by a life care planner and economist) were sufficient to meet the standard for submission to a jury. The trial court had heard argument on the motion *in limine* regarding damages for the claim for loss of

earnings and permitted the parties to brief the issue. At the close of trial, the court heard argument concerning the evidence presented and concluded that Appellant's case lacked a foundation of permanency concerning K.B.'s injuries and struck Appellant's claims for future economic damages.

On February 23, 2024, the jury returned a verdict in favor of Appellees. Specifically, although the jury found that the conduct of Dr. Burkland had fallen below the applicable standard of care, the jury decided that Dr. Burkland's negligence was not the factual cause of any harm to K.B. (*See* Jury Verdict Sheet, 3/5/24, at 1-4). Thus, the jury did not award Appellant any damages. (*See id.*).

On March 5, 2024, the verdict was entered on the docket. On March 6, 2024, Appellant timely filed a post-trial motion, challenging several of the court's jury instructions as well as the court's dismissal of Appellant's claims for future medical expenses and future earnings. On April 10, 2024, the court denied Appellant's motion. On April 11, 2024, judgment was entered in favor of Appellees and against Appellant.

On April 18, 2024, Appellant timely filed a notice of appeal. On April 19, 2024, the court ordered her to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. On April 23, 2024, Appellant timely complied.

On appeal, Appellant raises the following issues for our review:

> 1. Where, as here, in a medical professional liability action the Trial Court misapprehends a well-established, substantive principle of Pennsylvania law relating to jury charges on the issue of causation thereby refusing to give two separate suggested standard jury charges and where

- 7 -

the jury returns a verdict finding that one of the Defendant medical professionals was negligent, but that said negligence was not a factual cause of the minor-plaintiff's injuries and damages, whether the Trial Court abused its discretion by overriding or misapprehending the law when refusing to provide the jury two separate charges supported by the evidence thereby prejudicing [Appellant's] case by "probably misleading" or "not making clear" to the jury the issues in the case and thereafter denying [Appellant's] Post-Trial Motion for a New Trial?

2. Where, as here, in a medical professional liability action the Trial Court denies a motion for compulsory nonsuit at the close of [Appellant's] case and thereafter denies a motion for directed verdict after the close of all evidence indicating on both occasions that there were issues to be determined by the jury as fact-finder and thereafter *sua sponte* dismissed [Appellant's] claims for future economic damages in the form of future medical expenses and future lost earnings despite the testimony of two separate expert witnesses on these issues and thereafter compound the *sua sponte* dismissal of these claims by providing the jury an improper "corrective charge" regarding the dismissal, whether the Trial Court misapprehended the law and its role in the trial or overrode the law in so doing and thereafter in denying [Appellant's] Post-Trial Motion for a new trial?

(Appellant's Brief at 5-7).

In Appellant's first issue, she argues that the trial court erred by improperly refusing to provide the "increased risk of harm" jury instruction.[6]

_____

[6] Additionally, Appellant argues that the court erred in forcing her trial counsel to choose between two complementary standard jury charges on concurrent causation. According to Appellant, the charges serve distinct but related purposes – one charge addresses liability, and the other addresses damages. Appellant claims the charges should be given together when supported by the evidence. Appellant insists the trial court's error in requiring her counsel to choose between the instructions caused the jury to misunderstand these legal concepts, and the court should have issued both instructions.

*(Footnote Continued Next Page)*

charge and complementary instructions on concurrent causation. According to Appellant, Pennsylvania law requires that where there is competent medical testimony that a defendant's conduct increased the risk of harm, the jury **must** be instructed on this "relaxed" causation standard. Appellant insists that her expert testified extensively regarding the delayed c-section, which Appellant asserts created progressive risks over a 2.5-hour period. Under these circumstances, Appellant contends the requested instruction on increased risk of harm was mandatory. Appellant insists the court's failure to provide this instruction likely misled the jury, as evidenced by the jury's finding of negligence without causation. Appellant concludes she is entitled to a new trial on these grounds. We disagree.

Our standard of review when considering the adequacy of jury

_____

Here, the trial court indicated to the parties that it would be removing SSJI 7.90, other contributing causes, from the jury charge. (*See* N.T. Trial, 2/22/24, at 36). Appellant's counsel argued that it was an extremely important charge that should be given, and the court stated that SSJI 13.150, concurring causes, "covers the same thing" and that it would give Appellant a charge for either 13.150 or 7.90, but not both. (*See id.* at 36-37). At that time, counsel stated, "I would request 7.90." (*See id.*) Notably, Appellant's counsel did **not** lodge an objection on the record at that time. (*Id.*) Further, at the end of the jury charge, counsel did not object or offer any further questions when asked by the trial court. (*See* N.T. Trial, 2/23/24, at 119-20).

It is well settled that "an appellant must make a timely and specific objection to a jury instruction to preserve for review a claim that the jury charge was legally or factually flawed." *Carlini v. Glenn O. Hawbaker, Inc.*, 219 A.3d 629, 643 (Pa.Super. 2019) (citation omitted). Based on the foregoing, Appellant has waived any claim that the court failing to issue the SSJI 13.150. *See id.* Thus, we confine our review of Appellant's first issue to her complaint regarding the court's failure to issue the increased risk of harm instruction.

instructions in a civil case is to determine whether the trial court committed a clear abuse of discretion or error of law controlling the outcome of the case. ***Pringle v. Rapaport***, 980 A.2d 159, 165 (Pa.Super. 2009) (citation omitted).

> "It is only when the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse[,] rather than clarify a material issue[,] that error in a charge will be found to be a sufficient basis for the award of a new trial." ***Id.*** (quotation and citation omitted); ***Commonwealth v. Chambers***, 602 Pa. 224, 980 A.2d 35, 49-50 (2009) ("[a] charge will be found adequate unless the issues are not made clear, the jury was misled by the instructions, or there was an omission from the charge amounting to a fundamental error"). Further:
>
>> [i]n reviewing a trial judge's charge, the proper test is not whether certain portions taken out of context appear erroneous. We look to the charge in its entirety, against the background of the evidence in the particular case, to determine whether or not error was committed and whether that error was prejudicial to the complaining party.
>
> ***Reilly by Reilly v. S.E. Pa. Transp. Auth.***, 507 Pa. 204, [231,] 489 A.2d 1291, 1305 (1985).

***Salsgiver Commc'ns, Inc. v. Consol. Commc'ns Holdings, Inc.***, 150 A.3d 957, 962-63 (Pa.Super. 2016).

The Pennsylvania Supreme Court has observed:

> A plaintiff is .... required to present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered. In many cases, this is not a problem for a plaintiff. However, certain cases make this an impossible standard. These are the cases in which, irrespective of the quality of the medical treatment, a certain percentage of patients will suffer harm.

An example of this type of case is a failure of a physician to timely diagnose breast cancer. Although timely detection of breast cancer may well reduce the likelihood that the patient will have a terminal result, even with timely detection and optimal treatment, a certain percentage of patients unfortunately will succumb to the disease. This statistical factor, however, does not preclude a plaintiff from prevailing in a lawsuit. Rather, once there is testimony that there was a failure to detect the cancer in a timely fashion, and such failure increased the risk that the woman would have either a shortened life expectancy or suffered harm, then it is a question for the jury whether they believe, by a preponderance of the evidence, that the acts or omissions of the physician were a substantial factor in bringing about the harm.

*Mitzelfelt v. Kamrin*, 526 Pa. 54, 67, 584 A.2d 888, 894 (1990).

To determine whether an increased risk of harm instruction is appropriate, first, "the plaintiff's expert [must] testify to a reasonable degree of medical certainty that the acts or omissions complained of **could** cause the type of harm the plaintiff suffered." *Klein v. Aronchick*, 85 A.3d 487, 492 (Pa.Super. 2014) (emphasis added). The second step of the test is "to determine whether the acts complained of **caused** the actual harm suffered by the appellant." *Id.* (citation omitted). Thus,

[o]nce a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in the plaintiff's position, and that the harm was in fact sustained, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm.

*Hamil v. Bashline*, 481 Pa. 256, 269, 392 A.2d 1280, 1286 (1978). *See also Klein, supra* at 493 (noting where plaintiff is unable to show by reasonable degree of medical certainty that physician's actions/omissions

caused resulting harm, but is able to show to reasonable degree of medical certainty that physician's actions/omissions increased risk of harm, question of whether conduct caused ultimate injury should be submitted to jury).

Instantly, the trial court observed:

> In this case, counsel for [Appellant] provided expert testimony from pediatric neurologist, Dr. Tiffani McDonough, on the issue of causation. [Appellant] also provided expert testimony from Dr. James Edwards on the issue of the applicable standard of care. Dr. Edwards testified, "I believe that they delayed performing her C-section and it should have been performed much earlier in the course. I think it was appropriate to perform it around 21:49, or kind of in the next 20 minutes after that. So right around 10 o'clock would have been the first kind of appropriate time to perform that C-Section and right around 11 would be the latest point." Dr. McDonough testified that a stroke had occurred at approximately the 10:00 p.m. mark. She further testified that the stroke was a result of a blood vessel clot and that K.B. was born via C-section at 12:32 a.m. Most notably, what was missing from [Appellant's] causation expert was any testimony linking how [Appellees'] negligent act or omission did anything to increase the risk of harm to [K.B.] once the stroke had occurred. … In this case, Dr. McDonough never testified that had the C-section been performed earlier, any injury suffered by [Appellant] would have lessened. She also never testified that any chance of recovery from the stroke was terminated by [Appellees'] failure to perform the C-section earlier in time. [T]he facts in this case are [distinguishable from] a Superior Court case in which plaintiff presented evidence that demonstrated that defendant's acts or omissions had increased the risk of harm to plaintiff. In [**Cruz v. Northeastern Hosp.**, 801 A.2d 602 (Pa.Super. 2002)], which involved a hypoxic-ischemic brain injury that occurred at birth, plaintiff presented evidence from an expert on the issue of causation. Specifically, plaintiff's expert testified that the child had been exposed to a prolonged toxic uterine environment in the womb and that "the type of injury that he sustained is an injury that occurs

over a period of time and so it is my opinion that the shorter that period of time would have been, the more likely it is that [the child] would not have sustained any injury at all. And the longer that period of time was the more likely it would be that he would have an injury and the more severe that injury would be." *Cruz, supra* at 609-10. Unlike in *Cruz*, where Plaintiff's expert necessarily linked the timing of the injury to the likelihood that the injury would have worsened, in this case, [Appellant's] expert failed to make the appropriate connection. At no point did Dr. McDonough testify that [K.B.'s] injuries would have been less severe had she been delivered sooner as the stroke had already happened. Additionally, there was never any mention by the court treating increased risk of harm as mutually exclusive with direct causation. Therefore, the court did not err in not providing the jury an instruction on increased risk of harm.

(Trial Court Opinion, 9/12/24, at 15-16) (internal record citations omitted).

The record supports the trial court's analysis. Instantly, Dr. Edwards opined that Appellees delayed performing the c-section and that it should have been performed around 10:00 p.m. due to fetal tachycardia. (*See* Video Deposition (played for jury at trial), 2/10/24, at 28-29, 94-120, 122-130, 258, 269). Dr. Edwards believed this was a deviation from the standard of care. (*See id.* at 29, 89-90). Dr. Edwards stated that his concerns, based upon the fetal monitoring strips, would be that the fetus was not tolerating labor, getting good profusion, or oxygenating well. (*Id.* at 92). Notably, although he testified at length regarding the decelerations K.B. experienced in the womb and the concerns that would stem from a failure to have good profusion, Dr. Edwards did **not** testify that the deviation from the standard of care caused

or worsened K.B.'s injury.[7]  (**See id.** at 92-93).

Similarly, Dr. McDonough opined that, based upon decelerations in K.B.'s fetal monitoring strips, K.B. was at risk for a stroke between 9:45 and 10:00 p.m., and that a stroke had occurred around the time of K.B.'s birth. (**See** N.T. Trial, 2/12/24 AM, at 77, 99-100).  Dr. McDonough testified further that she believed the damage to K.B.'s brain "started after this long deceleration, the subsequent tachycardia, seen between 9:45 and 10:00 p.m." (**See id.** at 101).  Dr. McDonough later opined that the stroke happened around 10:00 p.m.  (**See** N.T. Trial, 2/12/24 PM, at 54).  Nevertheless, as the trial court accurately states, Dr. McDonough did **not** testify that any act by Appellees would have lessened any damage suffered by K.B. or that an earlier c-section would have prevented further damage.  Indeed, at birth, K.B. was discharged to the well baby nursery and the damage resulting from K.B.'s stroke was not discovered until many months after birth.

In sum, our review of the record confirms that Appellant provided expert testimony that the acts of Appellees deviated from the standard of care. However, to be entitled to a jury instruction on the increased risk of harm, Appellant was required to provide testimony, to a reasonable degree of medical certainty, that the acts and omissions complained of could cause the

---

[7] As noted **supra**, Dr. Edwards did not testify as an expert in causation and he testified only that chorioamnionitis may increase the risk of a brain injury. (**See** N.T. Trial, 2/10/24, at 102).  Nevertheless, he did not testify, to a reasonable degree of medical certainty, that the acts or omissions of Appellees, with respect to the delay in the c-section, resulted in a chorioamnionitis-caused stroke.  **See Klein, supra**.

type of harm suffered by K.B. *See Klein, supra*. Because Appellant's expert witnesses did not state, within a reasonable degree of medical certainty, that Appellees' failure to perform the c-section earlier could either cause or increase the risk of harm of the type of brain injury suffered by K.B., Appellant was not entitled to the increased risk of harm jury instruction. *See Hamil, supra*; *Klein, supra*. On this record, the court did not abuse its discretion in refusing to give the requested charge.[8] *See Pringle, supra*. Accordingly, we affirm.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/26/2026

---

[8] Appellant's second issue is that the court erred by denying her post-trial motion for a new trial based upon the court's dismissal of Appellant's claim for future medical expenses, and future lost wages. We reiterate that the jury did not find a causal connection between the injuries at issue and Appellees' conduct. (*See* Jury Verdict Sheet, 3/22/24, at 2); *see also Barton v. Lowe's Home Centers, Inc.*, 124 A.3d 349, 359 (Pa.Super. 2019) (stating: "To prevail in a negligence action, the plaintiff must show that the defendant had a duty to conform to a certain standard of conduct, that the defendant breached that duty, that such breach caused the injury in question, and actual loss or damage"). Therefore, any issue regarding damages is moot and we decline to address this issue further. *See In re J.G.*, 320 A.3d 1286, 1290 (Pa.Super. 2024) (stating: "Generally, this Court will not decide moot or abstract questions").